EXHIBIT 9

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

▷

Only the Westlaw citation is currently available.NOT
FOR PUBLICATION

United States District Court,
D. New Jersey.
Rachel B. MORLEY, Plaintiff,
v.
AVAYA INC. LONG TERM DISABILITY PLAN
FOR SALARIED EMPLOYEES, et al ., Defendants.

Civil Action No. 04-409 (MLC).
Aug. 3, 2006.

Kevin E. Barber, Niedweske Barber, PC, Morristown,
NJ, for Plaintiff.

Kori Ann Connelly, Swartz Campbell LLC, Phila-
delphia, PA, for Defendants.

## MEMORANDUM OPINION

COOPER, District Judge.

*1 The parties have filed various motions and
cross motions for summary judgment in an Employee
Retirement Income Security Act ("ERISA") action
brought by the plaintiff, Rachel B. Morley. Morley
asserts claims against the defendants, Avaya Inc.
("Avaya") Long Term Disability Plan for Salaried
Employees ("Avaya LTD Plan"), Gates McDonald,
Inc. ("Gates"), Plan Administrator of the Avaya LTD
Plan ("Plan Administrator"), and Avaya Benefit
Claim and Appeal Committee ("BCAC") (collec-
tively, "the defendants"), for (1) wrongful denial of
benefits under 29 U.S.C. § ("Section") 1132(a)(1)(B),
(2) breach of fiduciary duty, and (3) disclosure penal-
ties under Section 1132(c). (Compl.)

The defendants move for summary judgment
pursuant to Federal Rule of Civil Procedure ("Rule")
56(c) seeking to have the Court apply an "arbitrary
and capricious" standard of review to determine
Morley's entitlement to LTD benefits under the Avaya
LTD Plan. (Dkt. entry no. 27.) Morley cross-moves
for summary judgment seeking to have the Court
review her wrongful denial of LTD benefits claim
under a *de novo* standard. (Dkt. entry no. 31.) The
Court will (1) deny the part of the cross motion to
determine the standard of review to the extent it seeks
to have the Court apply a *de novo* standard, and (2)
deny without prejudice the part of the cross motion to
the extent it seeks to have the Court apply a height-
ened arbitrary and capricious standard of review. The
Court will also (1) grant the part of the motion seeking
to have the Court apply an arbitrary and capricious
standard of review, and (2) deny without prejudice the
part of the motion seeking to have the Court apply the
arbitrary and capricious standard of review without
heightened scrutiny.

The defendants have also separately moved for
summary judgment on Morley's claim for disclosure
penalties under Section 1132(c). (Dkt. entry no. 28.)
Morley has cross-moved for summary judgment
seeking an award of penalties on this claim. (Dkt.
entry no. 30.) The Court will (1) grant the motion
seeking dismissal of the disclosure claim, and (2) deny
Morley's cross motion seeking an award of disclosure
penalties.

The defendants have moved for summary judg-
ment seeking to offset (1) social security disability
benefits, (2) workers' compensation benefits, and (3)
monies paid as part of an employment discrimination
lawsuit, against any potential award of LTD benefits.
(Dkt. entry no. 29.) The Court will (1) grant the part of
the motion seeking an offset of (a) social security
benefits, and (b) temporary workers' compensation
benefits, (2) deny the part of the motion seeking an
offset for monies paid to Morley as part of her em-

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

ployment discrimination lawsuit against Avaya, and (3) deny without prejudice the part of the motion seeking an offset for any award of permanent workers' compensation benefits.

The defendants also move for summary judgment on (1) the breach of fiduciary duty claim, and (2) the wrongful denial of benefits claim as to BCAC and Gates. (Dkt. entry no. 45.) The Court will grant the motion.

**\*2** The defendants have also moved, and Morley has cross-moved, to determine the scope of the administrative record. (Dkt. entry nos. 46, 47.) The Court, for the reasons stated herein, will (1) grant the part of the motion seeking to include all documents reviewed by both BCAC Committees (through December 10, 2004), and (2) deny the part of the cross motion seeking to limit the scope of the administrative record to include only those documents submitted from December 2001 (for BCAC's first review) through the commencement of this litigation on January 29, 2004. The Court will also (1) grant the part of the motion seeking to exclude certain documents, including proposed exhibits 4, 14, 67, 77, 80, 132-133, 141-142, 144, and 147-152, and (2) deny without prejudice the part of the motion seeking to exclude proposed exhibits 11, 35-37, 47-48, 98-99, and 134-35. The Court will further (1) grant the part of the cross motion seeking to (a) exclude records relating to Morley's superior court litigation against Avaya from the administrative record, and (b) include the (i) January 23, 2002 report of John Knightly, MD, (ii) January 30, 2002 job description prepared by James Bird of Avaya, (iii) March 11, 2004 report of Allyson K. Hurley, DDS, and (iv) February 10, 2003 medical report by Donald H. Frank, MD, in the administrative record, (2) deny the part of the cross motion insofar as it seeks to exclude from the administrative record (a) any "guidance, comments, or information" provided by BCAC Medical Advisor Alladin Motta, MD, and (b) the report of Joseph Basinger, MD, and (3) deny without prejudice the part of the cross motion to the

extent that it seeks to include in the administrative record proposed exhibit 11.

***BACKGROUND***
**I. Materials Considered**
   The Court has, in addition to the other documents of record, considered:

   (1) Defendants' Brief in Support of Motion for Summary Judgment to Determine the Standard of Review ("Defs. Standard Br.") and January 27, 2006 Certification of Kori A. Connelly, Esq. ("1-27-06 Connelly Cert. I"), with attached exhibits. (Dkt. entry no. 27.)

   (2) Defendants' Brief in Support of Motion for Partial Summary Judgment on Disclosure Claim ("Defs. Disclosure Br.") and January 27, 2006 Connelly Certification ("1-27-06 Connelly Cert. II"), with attached exhibits. (Dkt. entry no. 28.)

   (3) Defendants' Brief in Support of Motion for Summary Judgment as to the LTD Offset Issue ("Defs. Offset Br.") and January 29, 2006 Connelly Certification ("1-29-06 Connelly Cert."), with attached exhibits. (Dkt. entry no. 29.)

   (4) Plaintiff's Brief in Support of Cross Motion for Summary Judgment on Disclosure Penalties ("Pl. Disclosure Br.") and January 27, 2006 Certification of Matthew Justice Vance, Esq. ("1-27-06 Vance Cert. I"), with attached exhibits. (Dkt. entry no. 30.)

   (5) Plaintiff's Brief in Support of Cross Motion for Summary Judgment to Determine the Standard of Review ("Pl. Standard Br.") and January 27, 2006 Vance Certification ("1-27-06 Vance Cert. II"), with attached exhibits. (Dkt. entry no. 31.)

   **\*3** (6) Defendants' Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment on Disclosure Penalties ("Defs. Disclosure Opp. Br.") and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

February 10, 2006 Connelly Certification ("2-10-06 Connelly Cert. I"), with attached exhibits. (Dkt. entry no. 33.)

(7) Defendants' Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment to Determine the Standard of Review ("Defs. Standard Opp. Br.") and February 10, 2006 Connelly Certification ("2-10-06 Connelly Cert. II"), with attached exhibits. (Dkt. entry no. 34.)

(8) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment as to LTD Offset Issue ("Pl. Offset Opp. Br.") and February 10, 2006 Vance Certification ("2-10-06 Vance Cert. I"), with attached exhibits. (Dkt. entry no. 35.)

(9) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment on the Disclosure Claim ("Pl. Disclosure Opp. Br.") and February 10, 2006 Vance Certification ("2-10-06 Vance Cert. II"), with attached exhibits. (Dkt. entry no. 36.)

(10) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Determine the Standard of Review ("Pl. Standard Opp. Br.") and February 10, 2006 Vance Certification ("2-10-06 Vance Cert. III"), with attached exhibits. (Dkt. entry no. 37.)

(11) Defendants' Brief in Opposition to Plaintiff's Cross Motion to Determine the Standard of Review ("Defs. Standard Opp. Br.") and February 10, 2006 Connelly Certification ("2-10-06 Connelly Cert. III"), with attached exhibits. (Dkt. entry no. 38.)

(12) Plaintiff's Reply Brief in Support of Cross Motion for Summary Judgment to Determine the Standard of Review ("Pl. Standard Reply Br.") and February 27, 2006 Vance Certification ("2-27-06 Vance Cert."), with attached exhibits. (Dkt. entry no. 40.)

(13) Plaintiff's Reply Brief in Support of Cross Motion for Summary Judgment on Disclosure Penalties ("Pl. Disclosure Reply Br."). (Dkt. entry no. 41.)

(14) Defendants' Reply Brief in Support of Motion for Partial Summary Judgment on Disclosure Claim ("Defs. Disclosure Reply Br.") and March 2, 2006 Connelly Certification ("3-2-06 Connelly Cert. I"), with attached exhibits. (Dkt. entry no. 42.)

(15) Defendants' Reply Brief in Support of Motion for Summary Judgment as to LTD Offset Issue ("Defs. Offset Reply Br.") and March 2, 2006 Connelly Certification ("3-2-06 Connelly Cert. II"), with attached exhibits. (Dkt. entry no. 43.)

(16) Defendants Brief in Support of Motion for Summary Judgment on Plaintiff's Breach of Fiduciary Duty Claim ("Defs. Fiduciary Br.") and March 14, 2006 Connelly Certification ("3-14-06 Connelly Cert."), with attached exhibits. (Dkt. entry no. 45.)

(17) Defendants' Brief in Support of Motion for Summary Judgment to Determine the Scope of the Administrative Record ("Defs.Admin.Rec.Br."). (Dkt. entry no. 46.)

(18) Plaintiff's Brief in Support of Cross Motion for Summary Judgment to Settle the Contents of the Administrative Record ("Pl.Admin.Rec.Br.") and March 14, 2006 Vance Certification ("3-14-06 Vance Cert."), with attached exhibits. (Dkt. entry no. 47.)

*4 (19) Defendants' Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment to Settle the Contents of the Administrative Record ("Defs.Admin.Rec.Opp.Br.") and March 20, 2006 Connelly Certification ("3-20-06 Connelly Cert."), with attached exhibits. (Dkt. entry no. 48.)

(20) Plaintiff's Brief in Opposition to Defendants'

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

Motion for Summary Judgment on Breach of Fiduciary Duty Claim ("Pl. Fiduciary Opp. Br.") and March 20, 2006 Vance Certification ("3-20-06 Vance Cert. I"), with attached exhibits. (Dkt. entry no. 49.)

(21) Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Determine the Scope of the Administrative Record ("Pl.Admin.Rec.Opp.Br.") and March 20, 2006 Vance Certification ("3-20-06 Vance Cert. II"), with attached exhibits. (Dkt. entry no. 50.)

(22) Plaintiff's Reply Brief in Support of Cross Motion for Summary Judgment to Settle the Contents of the Administrative Record ("Pl. Admin. Rec. Reply Br.") and March 27, 2006 Vance Certification ("3-27-06 Vance Cert."), with attached exhibits. (Dkt. entry no. 51.)

**II. Factual And Procedural History**

**A. Morley's Employment at Avaya & Alleged Injury**

Morley is a former Avaya employee who was injured in December 2001. (Dkt. entry no. 39, Joint Final Pretrial Order ("Pretrial Ord."), at 4.) Avaya had formerly employed Morley as a manager responsible for services on corporate flights. (1-29-06 Connelly Cert., at Ex. A, 12-20-04 Morley Dep. Tr. ("Morley Tr."), at 19.) [FN1] Morley's responsibilities included, *inter alia,* (1) managing a small flight attendant staff, (2) requisitioning and delivering catering services on flights, (3) budgeting for staff and catering, (4) establishing maintenance of cabin safety, and (5) delivering in-flight services. (Morley Tr., at 19-24.) Morley testified that she injured her back by lifting and carrying food trays while attending a culinary training class on December 21, 2001. (*Id.* at 48-50.) Morley suffered a herniation of the L5-S1 intervertebral disc. (1-29-06 Connelly Cert., at Ex. B, Attending Physician, Dr. John Knightly's 6-7-02 Stmt. of Disability for

Morley .) Morley's last day of work with Avaya was December 21, 2001. (Pretrial Ord., at 4.)

> FN1. Morley had worked as a corporate flight attendant for Avaya's predecessor, Lucent Technologies ("Lucent"). (Morley Tr., at 18.)

**B. Morley's Application to Gates for LTD Benefits & Terms of LTD Plan**

Morley initially received short-term disability benefits from Avaya, and she applied for LTD benefits under the Avaya LTD Plan in July 2002 after her short-term disability benefits expired. (Compl., at ¶ 16; Pretrial Ord., at 4.) Morley submitted the claim for LTD benefits to the Claims Administrator, Gates. (Pretrial Ord., at 4.) At the time Morley's benefit claim was under review, the Avaya LTD Plan operated under a Summary Plan Description ("Avaya SPD"), effective January 1, 2001. (Defs. Standard Br., at 5; 1-27-06 Connelly Cert. I, at Ex. A, Avaya SPD.) [FN2] The Avaya SPD provides in pertinent part the following "Claim Denial and Appeal Procedure[ ]":

> FN2. Lucent "spun off" Avaya in October 2000, such that "originally all of the Avaya Plans were Lucent Plans." (Defs. Standard Br., at 5; 1-27-06 Connelly Cert. I, at Ex. B, 2-3-05 Ronald M. Hershkowitz Dep. Tr. ("Hershkowitz Tr."), at 99.)

**\*5** Participants ... have the right under ERISA and the LTD Plan to file a written claim for benefits with the Claims Administrator [ (Gates) ].

If a claim is denied in whole or in part, the claimant will receive a written notice from the Claims Administrator of the Claims Administrator's decision, including the specific reason for the decision, within 90 days after the Claims Administrator received the claim. The written notice will include[, *inter alia,]* [t]he specific reason(s) for the denial....

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

* * *

If you submit your claim according to the procedures described in this section and you do not hear from the Claims Administrator within the time limits given here, your claim is considered denied.

If a claim for benefits is denied in whole or in part, or if you ... believe that benefits under the LTD Plan to which you are entitled have not been provided, an appeal process is available to you. You ..., or your authorized representative may appeal in writing within 180 days after the denial is received or the 45-day period (as extended) period [sic] has expired.

**Appeal Procedures**

A claimant can appeal a denied claim if[, *inter alia,]* ... [w]ritten denial of the claim is received within the appropriate time frame and the claimant wants to appeal it.

If you wish to file an appeal, you must do so in writing within 180 days of receiving notification of the Claims Administrator's decision. You are entitled to request a copy and review the LTD Plan "Plan Document" when you prepare your appeal. If you believe an error has occurred, you can support your request by giving the reason you think there is an error.... Send a written request for review of any denied claim directly to the Claims Administrator[ .]

The Claims Administrator will conduct a review and make a final decision within 60 days after receiving the written request for review.

Although this decision is final and not subject to further review, you ... may have additional rights under ERISA. However, applicable law and the LTD Plan's provisions require you to pursue all your claim and appeal rights on a timely basis *before* seeking any

other legal recourse regarding claims for benefits.

(Avaya SPD, at 17-19 (emphasis in original).) The Avaya SPD further states that the Plan Administrator has

full discretionary authority and power to control and manage all aspects of the LTD Plan, to determine eligibility for LTD Plan benefits, to interpret and construe the terms and provisions of the LTD Plan, to determine questions of fact and law, to direct disbursements, and to adopt rules for the administration of the LTD Plan as they may deem appropriate in accordance with the terms of the LTD Plan and all applicable laws.

(*Id.* at 21.)

The Avaya SPD indicates that it "is designed to describe the Avaya [LTD Plan] in easy-to-understand terms. It is shorter and less technical than the legal LTD Plan document. However, it is the Plan document and contract that determine your rights under the Plan. In all instances, the Plan document will govern." *(Id.)*

**\*6** Lucent's "Long-Term Disability Plan for Management Employees" (the "Lucent LTD Plan") was also operative before the promulgation of the Avaya LTD Plan and was the basis of the Avaya SPD. (1-27-06 Connelly Cert. I, at Ex. C., 9-15-04 Aff. of Shelley Anderson ("Anderson Aff."), at 2.) The Lucent LTD Plan provides that:

The Claims Administrator shall serve as the final review Committee under the Plan and shall have sole and complete discretionary authority to determine conclusively for all parties, and in accordance with the terms of the documents or instruments governing the Plan, any and all questions arising from the administration of the Plan and interpretation of all Plan provisions, determination of all questions relative to participation of Eligible Employees ... and eligibility for benefits, determination of all relevant facts, the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

amount and type of benefits payable to any Eligible Employee ... and construction of all terms of the Plan. The Claims Administrator shall use appeals procedures that comply with the requirements of ERISA.

Notwithstanding the foregoing, Lucent ... shall have sole and complete discretionary authority to determine questions relating to eligibility of employees for membership in the Plan and to amend or terminate the Plan at any time. Respective decisions by the Claims Administrator and Lucent ... shall be conclusive and binding on all parties and not subject to further review.

(1-27-06 Connelly Cert. I, at Ex. D, Lucent LTD Plan, at 19.)

The Avaya LTD Plan provides an additional layer of internal appellate review by which claimants may appeal LTD claim denials by the Claims Administrator, Gates, to BCAC. (Anderson Aff., at 1-2; *see* 1-27-06 Connelly Certif. I, Ex. E, Avaya LTD Plan ("The written request for review of any denied claim or other disputed matter should be sent directly to BCAC.").) The Avaya LTD Plan also states that:

BCAC shall serve as the final authority under the Plan and shall have sole and complete discretionary authority to determine conclusively for all parties, and in accordance with the terms of the documents or instruments governing the Plan, any and all questions arising from administration of the Plan and interpretation of all Plan provisions, determination of all questions relating to participation of Salaried Employees and eligibility for Disability Benefits, determination of all relevant facts, the amount and type of Disability Benefits payable to any Participant, and construction of all terms of the Plan.

* * *

The BCAC shall be the final review committee,

with the authority to uphold or overturn denials of Disability Benefits by the Claims Administrator.

(*Id.* at AV 01286-01287.) The Avaya LTD Plan further provides, under the heading "Conclusive Determination by the BCAC" that

[t]he BCAC shall be the final review committee under the Plan, with the authority to determine conclusively for all parties any and all questions arising from the administration of the Plan, and shall have sole and complete discretionary authority and control to manage the operation and administration of the Plan, including, but not limited to, the determination of all questions relating to eligibility for participation and Disability Benefits, interpretation of all Plan provisions, determination of the amount and kind of Disability Benefits payable to any Participant ..., and construction of disputed or doubtful terms. Such decisions shall be conclusive and binding on all parties and not subject to further review.

**\*7** (*Id.* at AV 01287.)

Gates denied Morley's claim for LTD benefits by letter dated August 13, 2002. (Pretrial Ord., at 5.) In the letter, Gates advised Morley that it denied her claim because her doctor, Dr. Knightly, did not "totally disable you from any occupation and to date has not submitted any further medical documentation to support the [LTD] benefit." (*Id.*)

**C. Morley's Request for Disclosures**
Morley's counsel submitted a request for disclosures by letter dated December 20, 2002, addressed to the "Secretary, Avaya [BCAC]", including a carbon copy to the "Plan Administrator." (*Id.* at 6.) Morley's counsel requested the disclosure of 15 categories of items:

(1) the Plan's Summary Plan Description;

(2) the underlying plan document; i.e., the doc-

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

ument which is summarized by the Summary Plan Description;

(3) any Summary of Material Modifications issued since the time Ms. Morley's participation in the Plan commenced;

(4) the last-filed Form 5500, including any schedules, addenda, and attachments;

(5) any reports, analyses, documents, and/or opinions generated by, prepared by, or contributed to by Dr. Scott Eisenberg with respect to Ms. Morley;

(6) any document(s), manual(s), and/or resource(s) relied upon by Dr. Eisenberg in assessing and/or opining on Ms. Morley's condition; if same is part of a multi-volume treatise or compilation, ... a copy of the section or subpart containing the above-noted information and provide adequate citations to those portions not provided;

(7) any schedules, methodologies, procedures, training materials, or any other documents relied upon by any representative of Ms. Morley's former employer, any third-party administrator or service provider, or any representative of an organization affiliated with or related to the plan sponsor in determining Ms. Morley's entitlement to benefits under the Plan (save for those documents provided in response to item # 6 herein);

(8) with respect to Ms. Morley's participation in the Plan, and save for any information provided in response to items # 5 and item # 6 herein, any reports, analyses, documents, and/or opinions generated by, relied upon, prepared by, or contributed to by any individual employed by, affiliated with, or associated in any way with the Plan, the plan sponsor, or any third-party administrator;

(9) any document(s), manual(s), and/or re-

source(s) relied upon by any individual or organization (save for the material provided in response to item # 5 and item # 6 herein) in assessing and/or opining on Ms. Morley's condition; if same is part of a multi-section treatise or compilation, ... a copy of the section or subpart containing the above-noted information and provide adequate citations to those portions not provided;

(10) with respect to Ms. Morley's participation in the Plan, please provide any documents generated by, relied upon, submitted to, prepared by, and/or contributed to by the Concentra Medical Examinations organization or any individual(s) affiliated with, employed by, or in any way connected with same;

**\*8** (11) any documents which describe, reference, explain, amplify and/or define the phrase "totally disable" as used in Ms. Gail M. Foley's letter to Ms. Morley dated August 13, 2002;

(12) any memoranda, notes, correspondence, computer files, electronic media, video tapes, recordings or any other document(s), or any concepts, ideas, or beliefs the expression of which is affixed in any tangible medium of expression generated with respect to the processing, analysis, review, and/or examination of Ms. Morley, her medical, surgical, health, and/or disability status, and/or her participation in the Plan;

(13) any prior or concurrent analyses performed with respect to Ms. Morley's participating in any plan or arrangement sponsored by the current Plan sponsor and any predecessor organization of or successor organization to the current Plan sponsor (whether or not said plan or arrangement is subject to ERISA) save for those items requested herein;

(14) save for those items provided in response to other requests herein, any schedules, methodologies, procedures, training materials, or any other documents

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

establishing a policy or policies for processing requests for long term disability benefits from the Plan; and

(15) save for those items provided in response to other requests herein, any other documents which relate to any aspect of Ms. Morley's entitlement to benefits, participation in the Plan, and/or the termination of Ms. Morley's benefits[.]

(1-27-06 Connelly Cert. II, at Ex. D, 12-20-02 Letter from Vance to BCAC.)

The Avaya Communication, Health, Environment & Safety Service processed the disclosure request on January 9, 2003. (1-27-06 Connelly Cert. II, at Ex. E, Defs. Answer to Request for Admissions No. 1.) BCAC, by letter dated January 29, 2003, provided Morley's counsel with a copy of (1) the Avaya SPD, (2) the Lucent LTD Plan, (3) a request to extend time to file a Form 5500, (4) the medical file from Gates, including (a) the Gates case summary, (b) claim log notes, (c) medical reports from Dr. Kaufman, (d) a Physician's Report dated January 9, 2002, (e) a report from Jane F. Kaiser, R.N., A.P.N., and (f) a report from Kristen Westa MSPT, and (4) a U.S. Compensation & Benefits News Special Report. (Pretrial Ord., at 6-7.) Hershkowitz, an attorney for BCAC, participated in a telephone conversation with Morley's counsel, Matthew Vance, on January 29, 2003. (*Id.*) During this conversation, Hershkowitz advised Vance that Avaya could not provide all of the requested information within the 30-day period, and extended the time for Morley to file her appeal because of the inability to produce the documents within 30 days of the date of her letter. (*Id.*) No summary of material modifications was made as of the time of Morley's request for disclosures other than as provided to her in the January 29, 2003 response. (*Id.* at 7.)

**D. Morley's Appeal to BCAC**
Morley appealed Gates's denial of her LTD ben-

efit claim by letter from her attorney dated February 11, 2003. (*Id.* at 5.) Shelley Anderson, Secretary for BCAC, advised Morley-through her attorney-by letter dated March 17, 2003, that BCAC tabled her appeal at its March 17, 2003 meeting until April 4, 2003. (*Id.*) BCAC informed Morley, by letter dated April 24, 2003 to her attorney, that BCAC denied her appeal for LTD benefits at an April 18, 2003 meeting. (*Id.*)

**E. The Complaint**
*9 Morley brought this action against the defendants on January 29, 2004. (Dkt. entry no. 1.) In Count I of the complaint, Morley alleges that the defendants wrongfully denied her claim for LTD benefits. (Compl., at 7-8.) Morley asserts in Count II that the defendants breached their fiduciary duty to her in violation of Section 1104. Morley alleges that the defendants "fail[ed] to provide her the basic due process guarantees required by 29 U.S.C. § 1133" by (1) wrongfully denying a full, fair and impartial review of her benefits claims; (2) ignoring records and opinions of her treating physicians showing she is disabled; and (3) providing a "claim denial and appeal denial which fails to provide certain items of information required in such denials." (Compl., at 8-9.) Morley also asserts that the defendants violated ERISA by failing to disclose certain documents to her. (Compl., at 9.) Morley seeks:

1.... [D]eclaratory and injunctive relief, finding that she is entitled to long-term disability benefits under the terms of the Plan and that [the d]efendants be ordered to pay long-term disability benefits according to the terms of the Plan until such time as ... [she] is no longer disabled or reaches the age of 65;

2.... [A]warding ... [her] the full $110.00 *per*-item, *per*-day penalty permitted by Title I of ERISA and the implementing regulations[;]

3.... [A]warding [her] all reasonable attorneys fees and expenses incurred as a result of [the] de-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

fendants' wrongful denial in providing coverage pursuant to 502(g)(1) of ERISA, 29 U.S.C. § 1132(g) [; and]

    4 ... [A]ward for such other relief as may be just and appropriate.

    (Compl., at 9-10 (emphasis in original).) The defendants answered the complaint on April 29, 2004. (Dkt. entry no. 7.)

**F. BCAC's Second Review of Morley's Claim**

    BCAC advised Morley by letter dated August 20, 2004, that it was meeting in September 2004, and would vote as to whether it would rehear her appeal since she had submitted three additional letters not in time for the original hearing. (Pretrial Ord., at 5.) The three letters included: (1) Dr. Marcia Sherman's April 11, 2003 report; (2) Dr. John Knightly's May 2, 2003 report; and (3) Dr. John Knightly's May 5, 2003 report. *(Id.* at 6.) BCAC agreed at a September 17, 2004 meeting to rehear Morley's appeal with the new documentation. *(Id.)* BCAC sent Morley's medical documentation in October 2004 to Dr. Joseph Basinger for his independent medical review. *(Id.)* Dr. Basinger prepared a report dated October 25, 2004. *(Id.)* BCAC provided a copy of that report to Morley. *(Id .)* At the BCAC meeting on December 10, 2004, BCAC again voted to deny Morley's appeal and entitlement to LTD benefits. *(Id.)*

### *DISCUSSION*
**I. Standard For Summary Judgment**

    Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317,

323 (1986). Once the movant has met this *prima facie* burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

    **\*10** The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). At the summary judgment stage, the Court's role is "not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. *Id.* at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

**II. Applicable Standard Of Review To Morley's Benefits Claim**

**A. Standards of Review**

    A district court should review a denial of ERISA plan benefits under a *de novo* standard of review

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

"unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." _Firestone Tire & Rubber Co. v. Bruch,_ 489 U.S. 101, 115 (1989). If the plan confers such discretion, a district court should apply a deferential "arbitrary and capricious" standard. _Id._ at 111-12; _Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan,_ 298 F.3d 191, 194 (3d Cir.2002). Under the arbitrary and capricious standard, a district court will uphold a plan administrator's interpretation of a plan if it is reasonable, i.e., unless the plan administrator's decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." _Pinto v. Reliance Stand. Life Ins. Co.,_ 214 F.3d 377, 393 (3d Cir.2000). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [plan administrator] in determining eligibility for plan benefits." _Mitchell v. Eastman Kodak Co.,_ 113 F.3d 433, 440 (3d Cir.1997).

"If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." _Firestone,_ 489 U.S. at 115; _see Kosiba v. Merck & Co.,_ 384 F.3d 58, 64 (3d Cir.2004) ( "[I]n reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations."). Thus,

**\*11** "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." _[Pinto,_ 214 F.3d at 378]. This "heightened" form of review is to be formulated on a sliding scale basis, which enables [a court] to "review[ ] the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of beneficiaries." [ _Id._] at 391

(quoting _Doe v. Group Hospitalization & Med. Servs.,_ 3 F.3d 80, 87 (4th Cir.1993)). In employing the sliding scale approach, [courts] take into account the following factors in deciding the severity of the conflict: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact "the presumed desire to maintain employee satisfaction." _[Id.]_ at 392.

_Stratton v. E.I. DuPont de Nemours & Co.,_ 363 F.3d 250, 254 (3d Cir.2004).

**B. Application of The De Novo Standard of Review Is Not Warranted**

Morley contends that the Court should apply a _de novo_ standard of review because the Avaya LTD Plan provides conflicting and ambiguous grants of discretion regarding employee plan eligibility between the Claims Administrator, Gates, and the Plan Administrator (or BCAC). (Pl. Standard Br., at 2.) Morley notes that the Plan provides that, _inter alia,_ the Claims Administrator-Gates-"shall serve as the final review committee under the Plan and shall have sole and complete discretionary authority to determine conclusively for all parties ... eligibility for benefits." (Id. at 4 (quoting Lucent LTD Plan, at 19).) Morley argues that this language shows that Gates is the final decision-maker as to eligibility under the Plan. (Id.)

Morley asserts that the Avaya SPD, however, provides the Plan Administrator with a conflicting grant of authority because it states that the "Plan Administrator has the full discretionary authority and power to control and manage all aspects of the LTD Plan." (Id. quoting Avaya SPD, at 21).) Morley contends that this grant of discretion to the Plan Administrator "directly conflicts" with the authority provided to Gates under the Plan. (Id.) Further, Morley points out that, to the extent that the defendants argue that BCAC is the final authority under the Plan, BCAC's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

by-laws provide no authority for BCAC to resolve long-term disability disputes; rather, the By-Laws "only provide authority for BCAC review of denials involving short term disability, pensions, and sickness and accident disability payments." *(Id.)*

Morley also asserts, assuming the Court finds no conflict in the grant of discretion, that she is entitled to *de novo* review because the Plan Administrator failed to properly exercise its discretion, as shown by "procedural irregularities and [the] magnitude of claims filing errors." *(Id.)* Morley contends that BCAC "usurped" Gates's discretion to serve as the final review committee under the Plan by acting as the "sole arbiter" of her appeal. *(Id. at 7-8.)* Morley also asserts that the defendants committed a "multitude" of administrative errors and demonstrations of bias towards her including, *inter alia,* (1) misinforming Morley of the proper time period in connection with her appeal rights, (2) characterizing the report of Morley's vocational capacity evaluator as "wordy BS," and (3) shredding materials generated during BCAC meetings. *(Id. at 8-13.)*

**\*12** The defendants argue that the Avaya plan documents "contain a 'clear and unequivocal' expression of intent to confer discretion on the Plan Administrator or its delegate the BCAC." (Defs. Standard Br., at 9.) The defendants point out that the Avaya SPD confers to Gates "unfettered decision-making authority as to benefit determinations." (Def. Standard Opp. Br., at 4.) Also, the Avaya SPD establishes appeal procedures by which claimants may submit an appeal to Gates. *(Id.* (citing Avaya SPD at 18).) The defendants assert that the plan documents then provide claimants an "internal review process" by which LTD claim determinations by "Gates may be appealed by claimants to the Plan Administrator, Avaya, which has established an internal [BCAC] to hear and decide appeals of claim denials." *(Id. at 5.)*

The defendants assert that the Avaya SPD provides that the Plan Administrator has " 'the full dis-

cretionary authority and power to control and manage all aspects of the LTD Plan, ... and to adopt rules for the administrator of the LTD Plan as they may deem appropriate in accordance with the terms of the LTD Plan and all applicable laws.' " *(Id.* at 6 (quoting Avaya SPD).) The defendants assert that the Plan Administrator, pursuant to this authority, delegated to BCAC the authority to review and make final decisions regarding appeals from LTD benefit determinations by Gates. *(Id.* at 5.) The defendants state that the Avaya LTD Plan provides that "BCAC shall be the final review committee under the Plan, with the authority to determine conclusively for all parties any and all questions...." *(Id.* at 6-7.) The defendants describe the BCAC appeal process as "provid[ing] an added measure of security for Plan Participants[, like Morley,] who contest the claims denials by Gates." *(Id.* at 5-6.)

The Court finds that the plan documents do not show a conflicting grant of discretion to justify applying a *de novo* standard of review to Morley's claim for wrongful denial of LTD benefits. In determining whether the Avaya LTD Plan grants clear discretion, the Court must examine the Plan language employing general principles of contract interpretation. *Firestone,* 489 U.S. at 112. The plan documents provide that the Plan Administrator retains full discretionary authority despite the initial grant of authority to Gates to administer LTD benefit claims. Pursuant to this authority, the Plan Administrator has delegated BCAC as the final review committee and the final authority for overturning or affirming LTD claim denials made by Gates. BCAC also has sole and complete discretionary authority for "the determination of all questions relating to the eligibility for participation and disability benefits." (Avaya LTD Plan, at AV 01287.) Although Gates is the initial decision-maker for LTD benefit claims, BCAC is involved as a second level internal appeals process for claim denials. The Plan Administrator, or BCAC as its delegatee, retains final authority regarding LTD benefit claims. Therefore, the Court will apply an arbitrary and capricious

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

standard of review to Morley's wrongful denial of benefits claim.[FN3]

> FN3. Morley's reliance on the BCAC by-laws and _Gritzer v. CBS, Inc ., 275 F.3d 291 (3d Cir.2002)_ in support of her argument for the application of _de novo_ review is misplaced. First, the BCAC by-laws are not part of the Avaya LTD Plan, and Morley has pointed to no language in any of the plan documents incorporating the by-laws. Thus, the Court will not consider the by-laws to analyze this issue. Second, as discussed above, procedural irregularities or bias is a consideration in determining the level of "heightened" review if the Court applies the arbitrary and capricious standard. In _Gritzer,_ the Third Circuit concluded that the deferential arbitrary and capricious standard was not applicable-irrespective of the plan language-where the Plan Administrator failed to make any decision during the pendency of the claim. 275 F.3d at 296. Here, the facts are undisputed that (1) Gates informed Morley of the reason for the denial of benefits, and (2) BCAC communicated the grounds for affirming the denial. As such, _Gritzer_ is inapplicable to the facts here.

**C. Application of The _Pinto_ Factors to Determine The Proper Level of Arbitrary And Capricious Review**

**\*13** The Court, "[i]n employing the sliding scale approach [to determine the appropriate level of arbitrary and capricious review, must] take into account the following factors in deciding the severity of the conflict: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary...." _Stratton,_ 363 F.3d at 254. As to the first factor, the defendants contend that "although Morley is an individual presumably with no experience in employee

benefit administration, the record demonstrates that she was represented by experienced ERISA benefits counsel during the pendency of the appeals process." (Defs. Standard Br., at 14.) Thus, they argue that "[n]o evidence exists to suggest that Morley was at any disadvantage in dealing with either Gates ... or BCAC in pursuing her benefit claim by virtue of any comparative inexperience in ERISA matters." _(Id.)_ Concerning the second factor, the defendants assert that Morley provided Gates and Avaya with all of the information they used to address Morley's claim. _(Id.)_

The defendants admit, for purposes of the third factor, that Gates is compensated by Avaya on a per claim basis. (Anderson Aff.) However, the defendants contend that the Court should apply only a slightly heightened arbitrary and capricious standard because of the similarity between the Avaya LTD Plan and the plan discussed by _Stratton._ (Def. Standard Opp. Br., at 12-14.) Finally, the defendants assert that Morley presents only one claim for LTD benefits and there is a lack of evidence that the value of the claim would significantly affect "a sizeable employer such as Avaya." _(Id._ at 13.)

Morley, although conceding that she was represented by counsel during the appeal period, claims that the first _Pinto_ factor weighs in favor of heightening the standard of review because she was not so represented during the initial claim period before Gates. As for the second factor, Morley contends that she was unaware of some of the information that Gates and BCAC considered, including information provided by "Avaya's Dr. Aladdin Motia." (Pl. Standard Opp. Br., at 7.) Morley argues that the defendants were also acting under a financial conflict of interest shown by various procedural irregularities and demonstrations of bias. _(Id.;_ Pl. Standard Br., at 14-15.) Concerning the fourth factor, Morley contends that Avaya's financial condition would potentially be significantly affected by any payment of LTD benefits to her because less than 30 participants out of a total of 8,194 receive benefits. _(Id.)_

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

The Court finds that an analysis of the four *Pinto* factors justifies at least a slightly heightened arbitrary and capricious standard of review. The second and fourth factors do not justify heightening the arbitrary and capricious standard. Regarding information accessability, Morley has only generally alleged that she was denied information and only vaguely refers to "an example of the imbalance [of information] involves Avaya's Dr. Aladdin Motia ." (Pl. Standard Opp. Br., at 7.) The Court has found no other references to information that the defendants allegedly withheld from Morley. As for the fourth factor, the record is unclear as to the potential effect of Morley's claim on Avaya's financial structure, although it appears highly unlikely that one claim would negatively impact such a large company. Morley has also offered no evidence regarding the financial health or long terms plans of Avaya that would undermine the "presumed desire to maintain employee satisfaction." *Pinto,* 214 F.3d at 392.

**\*14** The first and third factors, however, justify at least a slightly heightened arbitrary and capricious standard of review. Concerning the first factor, there appears to have been a sophistication imbalance between the parties during the initial claims process, as Morley was only represented by counsel during the appeal of her benefits claim denial. Also, the third factor-the financial arrangement between Gates and Avaya-warrants a slight heightening of the arbitrary and capricious standard.

Arrangements in which an employer either (1) funds a plan and pays an independent third party to interpret the plan and make plan benefits determinations, or (2) establishes a plan, ensures its liquidity, and creates an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits, do not, in themselves, constitute a *Firestone* conflict of interest. *Pinto,* 214 F.3d at 383. Here, Avaya (1) established BCAC, an internal benefits committee to review, *inter alia,* LTD benefit claim

denials, and (2) pays Gates on a per claim basis to serve as the Claims Administrator. Therefore, the Avaya LTD Plan could qualify as either of the two types of arrangements. As in *Stratton,* Morley has shown "no evidence that would give rise to an inference of conflict other than the fact that [Avaya] both funds and ultimately administers its own plan after outsourcing the initial phases of administration." 363 F.3d at 255. Therefore, the Court will heighten slightly the arbitrary and capricious standard to "accommodate what appears to be a potential, even if negligible, chance of conflict." *Id.*

## D. Other Considerations to Potentially Justify Heightening The Arbitrary And Capricious Standard

Morley has also alleged a variety of procedural irregularities and demonstrations of bias that she argues would justify the Court heightening the arbitrary and capricious standard. A heightened arbitrary and capricious standard may be appropriate if a plaintiff shows

"demonstrated procedural irregularities, bias or unfairness in the review [by the plan administrator] of the claimant's application for benefits." *Kosiba,* 384 F.3d at 66; *Vitale[v. Latrobe Area Hosp.,* 420 F.3d 278, 283 (3d Cir.2005).] This can come in the form of the either (a) plan administrator's "self-serving" use of one doctor's expertise; (b) inconsistent treatment of the same facts; and (c) when at a "crossroads," the plan administrator disfavors the claimant. *Pinto,* 214 F.3d at 393-94; *see also Kosiba,* 384 F.3d at 66. However, the claimant bears the burden of proving procedural bias or bad faith by presenting the court with specific evidence of bias. *See Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley,* 248 F.3d 206, 216 (3d Cir.2001) ("Unless specific evidence of bias or bad-faith has been submitted, plans ... are reviewed under the arbitrary and capricious standard["] ); *see also Goldstein v. Johnson & Johnson,* 251 F.3d 433, 435-36 (3d Cir.2001) (heightened arbitrary and capricious review is required when "the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

beneficiary has put fourth [sic] specific evidence of bias or bad faith in his or her particular case[ ]").

**\*15** *Michaux v. Bayer Corp.,* No. 05-1430, 2006 WL 1843123, at \*6 (D . N.J. June 30, 2006).

Morley alleges that the defendants committed a variety of administrative errors and examples of bias including, *inter alia,* (1) misinforming Morley of the proper time period to appeal, (2) handwritten notes and comments on Morley's appeal letter and other documents, and (3) shredding materials generated during BCAC meetings. (Pl. Standard Br., at 8-13.) The defendants point out that Hershkowitz, a legal advisor to BCAC, testified at his deposition that he made the handwritten notes on Morley's appeal letter and on the responses to her exhibits prior to the BCAC hearing. (Defs. Standard Opp. Br., at 15.) The defendants also state that there is a dispute as to whether BCAC destroys copies of hearing items. *(Id.* at 16.) The Court finds that there are disputed issues of material fact regarding the possible procedural irregularities and potential bias by BCAC. Therefore, the Court will defer a final determination as to the applicable level of "heightened" arbitrary and capricious standard of review until resolving these factual disputes at trial.

**III. Disclosure Penalties**

**A. Disclosure Requirements**

ERISA requires the disclosure of particular information by a Plan Administrator. Specifically, the Plan Administrator "shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement or contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Section 1132(c)(1)(B) provides that

[a]ny administrator ... who fails or refuses to comply with a request for information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

*Id.*

If an administrator does not comply with a request within the specified time, the Court has the discretion to assess a civil penalty. *See Romero v. Smithkline Beecham,* 309 F.3d 113, 120 (3d Cir.2002) (explaining that "[s]ection 502(c)(1), as noted, provides that a penalty may be imposed 'in the court's discretion' and that any such penalty may be in any amount 'up to $100 a day' "). "Appropriate factors to be considered in making these decisions include bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." *Id.* (citations and internal quotations omitted). Although prejudice is a factor for consideration, it is not "a *sine qua non* to a valid claim under section 502(c)(1)." *Id.*

**B. The Defendants Complied With Disclosure Requirements**

**\*16** The defendants contend that the Plan Administrator fully complied with ERISA's disclosure requirement. Morley argues that she was entitled to, and did not receive, the (1) BCAC by-laws, and (2) service agreement between Gates and Avaya.[FN4] The Court finds that Morley is not entitled to any penalties.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

FN4. Morley originally asserted that the Plan Administrator failed to disclose four documents: (1) a written statement indicating the length of her extension, (2) *Medical Disability Advisor*, by Presley Reed, M.D., (3) BCAC's by-laws, and (4) claims management guidelines. Morley has withdrawn her claims as to the written statement indicating the length of the extension, and the *Medical Disability Advisor*. (Pl. Disclosure Reply Br., at 1.)

1. BCAC by-laws

Morley asserts that she requested information that would have included the BCAC by-laws in her disclosure request. (Pl. Disclosure Br., at 15.) Morley argues that because the BCAC by-laws "essentially establish the governing body for resolving certain aspects of benefits requests, it is clearly a document 'under which the plan is established or operated.' " (*Id.* (quoting 29 U.S.C. § 1024(b)(4)).) Morley indicates that she was prejudiced by not having a copy of the BCAC by-laws because she would have been made aware that BCAC

(1) included a legal advisor, and any prepared materials by the legal advisor would have been discoverable;

(2) has a formal medical advisor, and she would have had the opportunity to inquire as to the medical advisor's opinion of her condition; and

(3) had no authority pursuant to its by-laws to resolve long-term disability claims.

(*Id.* at 16-18.)

The defendants claim that Morley's December 20, 2002 disclosure request did not include a request for the BCAC by-laws. (Defs. Disclosure Opp. Br., at 18.)

The defendants assert that "Morley's request to produce documents establishing a policy for processing requests for LTD benefits is not sufficiently specific to describe" the BCAC by-laws. (*Id.*) Therefore, the defendants argue that they had no duty to disclose the by-laws under Section 1024(b)(4). (*Id.*)

The defendants also point out that the BCAC by-laws are not one of the specifically enumerated documents required to be disclosed under Section 1024(b)(4). (*Id.*) The defendants assert that the "BCAC By-laws do not address how the Avaya LTD Plan is operated; rather, it sets forth the organization, membership and voting rights of the BCAC Committee." (*Id.* at 19.) The defendants further state that the BCAC by-laws do not (1) contain any information that would have assisted Morley in perfecting her appeal, (2) address a claimant's rights under the Avaya LTD Plan, or (3) provide any information about the definition of "disability" under the Plan. (*Id.*) The defendants also contend that Morley's allegations of prejudice-the inability to request materials prepared by or opinions of advisors to the BCAC-are irrelevant to the defendants' duty to disclose documents to assist her in perfecting her appeal under Section 1024(b)(4). (*Id.* at 19-20.)

The Court finds that Morley did not specifically request a copy of the BCAC by-laws in her disclosure request of December 20, 2002. None of the 15 submitted requests, and in particular requests # 7 and 15 (specifically referred to by Morley in her brief), include an explicit request for the BCAC by-laws. Morley has not identified how the BCAC by-laws would constitute a "schedule[ ], methodolog[y], procedure[ ], training material[ ], or any other document[ ] relied upon ... in determining [her] entitlement to benefits under the Plan" as requested in request # 7. Moreover, Morley has not demonstrated that the by-laws constitute "any other documents which relate to any aspect of [her] entitlement to benefits, participation in the Plan, and/or the termination of her benefits[.]"

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

*17 Even assuming for purposes of this motion and cross motion, that Morley had, in fact, included a request for the BCAC by-laws in her disclosure request, the BCAC by-laws is not a plan document or a document "under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). A document "under which the plan is established or operated" is not just "any document relating to a plan, but only formal documents that establish or govern the plan." *See Brown v. Am. Life Holdings,* 190 F.3d 856, 861 (8th Cir.1999) (agreeing with the definitions posited by the Fourth, Seventh, and Ninth Circuits as to documents "under which the plan is established or operated"). "This is not to say, of course, that companies have a permanent privilege against disclosing other documents. It means only that the affirmative obligation to disclose materials under [§ 1024(b)(4) ], punishable by [statutory] penalties, extends only to a defined set of documents." *Ames v. Am. Nat'l Can Co.,* 170 F.3d 751, 759 (7th Cir.1999). Morley's contention that the by-laws "specify procedures and authority for the resolution of disability claims" is without merit. The by-laws contain no provisions describing or providing the procedure for the resolution of LTD benefit claims, or otherwise address how the Avaya LTD Plan is operated.

Morley has also failed to show bad faith or intentional conduct on the part of the Plan Administrator or prejudice as a result of not having the BCAC by-laws. Morley's requests for disclosures do not expressly include a request for the BCAC by-laws, and the other requests are not sufficiently specific to put the defendants on notice that she was seeking them. Thus, Morley has failed to show bad faith or intentional conduct on the part of the Plan Administrator in not turning over the by-laws. Concerning prejudice, Morley's allegation that she was denied access to potential materials prepared by BCAC's "legal advisor" or "medical advisor" is immaterial. Morley was appealing Gates's decision to deny her claim for LTD benefits to BCAC itself. At the time she

submitted her request for disclosures, Morley had not filed her appeal to BCAC from Gates's decision. Although Morley has attached a copy of her February 11, 2003 appeal letter with notations apparently scribed onto it by Hershkowitz, she has not shown that these notations occurred before Morley filed her appeal and her case came before BCAC. This rationale applies equally to any opinions of BCAC's medical advisor, who would not have been presented with making a decision as to her disability status until Morley submitted her appeal from Gates's determination to BCAC.

Morley's argument that she was prejudiced by later discovering that BCAC allegedly had no authority to resolve long-term disability claims is also without merit. During oral argument, Morley's counsel indicated that if he had this information, he would have dealt with Gates instead of Avaya or BCAC. However, BCAC was the entity that handled Morley's appeal, so Morley filed her appeal with the correct entity. Morley also asserts that the by-laws would have provided her with "the opportunity to determine the LTD Plan's authority to hear additional, voluntary appeals." Morley has not identified any language in the by-laws that would have provided her with such an opportunity. For all of these reasons, Morley has failed to demonstrate that she was prejudiced by not having a copy of the BCAC by-laws.

2. Contract between Gates and Avaya

*18 Morley also claims that the Plan Administrator failed to disclose a "Professional Services Contract" (the "Contract") between the Avaya LTD Plan and Gates. (Pl. Disclosure Br., at 18.) Morley asserts that she included a disclosure demand for the Contract within the "fifteen (15) itemized items including an omnibus request." *(Id.)* Morley contends that if she had the Contract, she would have:

(1) "been on notice that the Avaya LTD Plan integrates issues relating to long-term and short-term disability and Workers' Compensation [and] crafted

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

her appeal document such that her entitlement to short term disability benefits was discussed, analyzed, and emphasized[;]"

(2) been able to challenge Gates's failure to secure a vocational assessment and its own independent medical examination;

(3) argued that "cost factors drive the decisions of those who are otherwise fiduciaries[;]"

(4) show that Gates relied upon the incorrect standard of disability in rejecting Morley's appeal; and

(5) request information about an "action plan" regarding her workers' compensation case.

(*Id.* at 18-21.)

The defendants contend that, although Morley asserts that she was entitled to a copy of the "Claims Management Guidelines," she has failed to show that "any such Claims Management Guidelines for the application of the LTD plan existed." (Defs. Disclosure Opp. Br., at 10.) The defendants point out that Lori Kools and Gail Foley, two Gates employees, did not testify at their deposition that Gates uses any claims management guidelines generally or that any guidelines were used in processing Morley's claim. (*Id.* at 10-11.) The defendants assert that the Contract does not constitute a "claim management guideline" because it merely sets forth "Gates'[s] obligations to Avaya in the administration of long term disability benefits, including the type and timeliness of reporting; working with other providers in handling claims; logistics for training and human resources, etc." (*Id.* at 11.) The Contract also includes provisions regarding Gates's payments from Avaya. The defendants argue that the Contract does not include any " 'guidelines' for how to handle LTD claims, but rather constitutes the agreement between the Plan and the Claims Administrator as to each party's respective duties and

obligations." (*Id.* at 11-12 .)

The Court finds that Morley did not specifically request a copy of the Contract or claims management guidelines in her disclosure request of December 20, 2002. None of the 15 requests include a request for the Contract or any claims management guidelines by explicit reference. Morley has generally contended that the Contract, at a minimum, would fall into the "omnibus request," or request # 15. Morley has not demonstrated that the Contract constitutes "any other documents which relate to any aspect of [her] entitlement to benefits, participation in the Plan, and/or the termination of her benefits[.]" Also, Morley has not shown that the Contract is a "claims management guideline." The Contract does not include procedures or "guidelines" for handling LTD benefit claims.

**\*19** Even assuming again that Morley included a request for the Contract (or claims management guidelines) in her disclosure request, it is not a plan document or a document "under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). Morley provides no case law to support her assertion that "claims management guidelines" are included in the group of required disclosures under Section 1024(b)(4). To the contrary, claims management guidelines have been determined not to fall within the scope of Section 1024(b)(4). *See, e.g., Doe v. Travelers Ins. Co.,* 167 F.3d 53, 60 (1st Cir.1999) (concluding that defendant's "mental health guidelines" that were part of basis for decision to deny benefits were not "one of the 'other instruments' [required to be produced under Section 1024(b)(4) ]"); *Tutolo v. Indep. Blue Cross,* No. 98-5928, 1999 WL 274975, at *2 (E.D.Pa. May 5, 1999) (determining that "documents detailing Defendant's appellate hearing procedures and describing the criteria Defendant used when deciding to deny approval for the ablation procedure ... fall outside of what § 1024(b)(4) requires"). Further, the Contract itself does not constitute a legal document that (1) describes the terms of the plan or its financial status, or (2) otherwise restricts or governs the Plan's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

operation.

Morley has also failed to show bad faith or intentional conduct on the part of the administrator, or prejudice as a result of not having the Contract. Similar to her alleged request for the BCAC by-laws, Morley's disclosure requests do not expressly include a request for the Contract. Moreover, the other requests are not sufficiently specific to put the defendants on notice that she was seeking a copy of the Contract. Thus, Morley has failed to show bad faith or intentional conduct on the part of the administrator in not disclosing the Contract.

Morley's allegations of prejudice also are without merit. Morley alleges that, knowing that Gates handled workers' compensation and short-term disability claims, she would have "crafted" her appeal to focus more on Morley's eligibility and receipt of short-term disability benefits. However, as explicitly stated in the Plan documents and, recognized by Morley in her appeal letter, the standards for eligibility for short-term disability and long-term disability benefits are not identical. Thus, Morley's eligibility and receipt of short-term disability benefits would not have been determinative to Gates's analysis of Morley's eligibility for LTD benefits. Morley has not identified how her short-term disability benefits eligibility or receipt of benefits would have altered her plan on appeal. In fact, the April 24, 2003 letter from BCAC denying Morley's appeal states that "[e]ligibility for LTD differs from that of STD. An employee must be unable to do any job for **any** employer to qualify for LTD, whereas for STD, the employee is totally disabled from performing the essential functions of his/her job at Avaya." (1-27-06 Vance Certif., at Ex. D (emphasis in original).)

**\*20** Morley also asserts that she could have challenged the Plan's failure to secure a vocational assessment or independent medical examination. (Pl. Disclosure Br., at 19.) However, Morley cites to nothing in the plan documents that would have re-

quired Gates to seek a vocational assessment or independent medical examination during her disability assessment. Also, the Contract's language requiring Gates to perform a vocational assessment or independent medical examination as required by Avaya is not specifically included in the Contract under the section discussing's Gates's relationship with Avaya as to the LTD Plan.

The Court further finds that Morley has not shown that she was prejudiced by (1) not knowing Gates's financial arrangement with Avaya, (2) the allegedly different definitions of disability in the Contract and in the Avaya Plan, and (3) the "action plan" in workers' compensation. Morley's only assertion about the action plan is that, if she knew about it, she could have requested the information from the defendants. Because Morley's claim was denied, any potential offsets were not at issue at the time Morley filed her appeal to BCAC. Also, although Morley makes a conclusory allegation that Gates used the wrong standard of disability in denying her claim, there is no indication from the August 13, 2002 letter from Gail M. Foley, that Gates relied upon the wrong standard. Furthermore, Morley does not allege how the payment relationship between Gates and Avaya would have altered the procedure or substance of her appeal, and she may argue such potential bias at trial.

**IV. LTD Benefits Offsets**

The defendants contend that any potential award of LTD benefits should be offset-under the terms of the Avaya LTD Plan-by Morley's receipt of (1) social security disability benefits, (2) workers' compensation benefits, and (3) monies paid as part of an employment discrimination lawsuit. (Defs. Offset Br., at 1.)

The Avaya SPD provides that an employee's "eligible pay" consists of the employee's "basic pay rate as determined from the payroll records of the Company and [his or her] target incentive." (Avaya SPD, at 7; Pretrial Ord., at 7.) Morley's base salary was $73,800. (Pretrial Ord., at 7.) Morley's "target

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

incentive" ("STIP"), was 10% at her management level as of 2002, or $7,380. *(Id.)* Thus, Morley's eligible pay for purposes of calculating LTD benefits is $81,180. *(Id.)*

The Avaya SPD provides that LTD benefits

are paid in combination with other sources of disability income so that your total LTD income from all sources would equal 60% of your LTD **eligible total pay.**

\* \* \*

**Other Sources of Disability Income**

The LTD Plan is designed to work with other sources of disability income to provide your total disability income. The LTD Plan looks at all of your sources of disability income (except disability income from individual insurance you have purchased), and makes up the difference after benefits which you are eligible to receive from other sources are determined, such as:

**\*21** • Primary Social Security benefits (payable to you),

• Workers' Compensation or any similar benefits,

• Any state or federal disability benefits except veteran's benefits, and

• Any Avaya Inc. pension benefits you may be eligible to receive at the time your LTD benefits begin.

(Avaya SPD, at 9 (emphasis in original).)

Before any potential offsets would be applied, 60% of Morley's base ($81,180) equals $48,708.

(Pretrial Ord., at 7.) Thus, if Morley is entitled to LTD benefits, then the Avaya LTD Plan would offset other sources of disability income from $48,708 to determine the net benefits payable to her.

Morley applied for and received Social Security Disability ("SSD") benefits. (Morley Tr., at 154.) Morley received an initial retroactive SSD lump-sum award of $12,574.50 in or about January 2004. (Pretrial Ord., at 7.) Morley then received $1,014 per month in SSD benefits from January 2004 until August 2004. *(Id.)* Morley's SSD monthly benefit was reduced to $938 per month in August 2004. *(Id.)* Morley had received a total of $35,694.50 in SSD benefits as of December 2005. *(Id.* at 7-8.)

Morley also received temporary total disability workers' compensation benefits from Avaya, as administered by Gates, in the amount of $591 per week from February 15, 2002 to November 30, 2005, totaling $117,018. *(Id.* at 8.) [FN5] No determination has been made that the plaintiff is permanently physically impaired for the purposes of workers' compensation benefits. *(Id.)* In addition, Morley settled a disability discrimination lawsuit filed against Avaya for approximately $12,000. (Defs. Offset Br., at 6; Pl. Offset Br., at 5.)

FN5. Morley still receives temporary workers' compensation benefits. (Pretrial Ord., at 8.)

**A. SSD Benefits**
The defendants argue that any potential award of LTD benefits should be offset by the monies Morley received as SSD benefits. Morley has conceded that the defendants are entitled to an offset against the full amount of her SSD benefits. (Pl. Offset Opp. Br., at 2.)

**B. Workers' Compensation**
The defendants assert that any award of LTD benefits under the Avaya LTD Plan should be offset

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

by the monies Morley received as temporary disability workers' compensation benefits. (Defs. Offset Br., at 10.) The defendants note that the Avaya SPD specifically provides for an offset of other sources of disability income, including, among other things, workers' compensation. *(Id.* at 10.) Morley, on the other hand, contends that not all of her workers' compensation benefits are in the form of disability income and, as such, the defendants are not entitled to a complete offset. The Court finds that the Avaya LTD Plan provides that all of Morley's temporary disability workers' compensation benefits would be offset against any potential award of LTD benefits.

An ERISA plan is interpreted in accordance with "the provisions of the [plan] ... in light of all the circumstances." *Firestone,* 489 U.S. at 112; *see In re Unisys Corp. Long-Term Disability Plan ERISA Litig.,* 97 F.3d 710, 715 (3d Cir.1996) ("The strongest external sign of agreement between contracting parties is the words they use in their written contract."). If the Court finds that the language of the plan is not ambiguous on its face, the provisions of the agreement should be enforced. *In re Unisys,* 97 F.3d at 715.

**\*22** The Court finds that the Avaya SPD unambiguously provides that workers' compensation benefits in the form of disability income are offset from any LTD benefit award. The temporary total disability benefits that Morley has been receiving is one of the three types of benefits that are available under the New Jersey Workers' Compensation Act ("NJWCA"). N.J.S.A. § 34:15-12. The temporary total disability benefits under the NJWCA are based on the claimant's wages. *Id.* An employee is entitled to 70% of the employee's weekly wages received at the time of the injury, subject to a maximum compensation of 75% of the average weekly wages earned by all employees covered by the NJWCA. *Id.* at § 34:15-12a. Temporary disability benefits are in lieu of weekly wages. *Young v. W. Elec. Co.,* 475 A.2d 544, 547 (N.J.1984). Thus, an employee that has not lost wages by reason of a temporary disability is not entitled to temporary

disability payments under the NJWCA. *Outland v. Monmouth-Ocean Educ. Serv. Comm'n,* 713 A.2d 460, 464 (N.J.1998). The parties do not dispute that Morley has received and continues to receive temporary total disability benefits under the NJWCA. Therefore, the Court finds that the monies Morley has received and continues to receive as temporary total disability benefits-which are in lieu of weekly wages-constitute "workers' compensation" as disability income under the Avaya LTD Plan.[FN6]

> FN6. No determination has been made to the extent of Morley's possible entitlement to permanent disability benefits under the NJWCA. Permanent disability benefits compensate for the employee's physical impairment to carry on the ordinary pursuits of life in addition to loss of income. *Olivero v. N.J. Mfrs. Ins. Co.,* 547 A.2d 710, 717 (N.J.App.Div.1988). It is premature to consider whether any monies paid for permanent disability benefits under the NJWCA should be offset against a potential award of LTD benefits because Morley has not been determined eligible to receive such benefits.

**C. Settlement Proceeds**

The defendants claim that they are entitled to an offset for some monies Morley received as part of a settlement of her New Jersey Law Against Discrimination ("NJLAD") claim against Avaya, Inc. in New Jersey state court. (Defs. Offset Br., at 14.) The defendants point out that the terms of the settlement agreement "require [Morley] to dismiss her state court action in exchange for: (a) payment in the amount of $12,487.22 less standard deductions and withholdings required by law 'for alleged lost wages ...'; (b) payment of $12,487.72 for 'alleged emotional distress/pain and suffering ...'; [and] (c) payment in the amount of $12,524.56 for attorneys' fees and costs." *(Id.* at 15.) The defendants argue that the amount Morley received for lost wages should be offset by the amount of any LTD benefit award because she would

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

"effectively receive a double recovery." (*Id.* at 16.)

Morley argues that the Avaya LTD Plan contains no language allowing the offset against a state court settlement. (Pl. Offset Opp. Br., at 5.) Plaintiff also asserts that the defendants have cited to no specific language in the plan permitting them to offset the proceeds of Morley's settlement. (*Id.*) The Court finds that any amount of the settlement proceeds that Morley received for "lost wages" does not offset against any potential award of LTD benefits.

The defendants concede that the Avaya SPD does not include in its offset provision the receipt of income as a result of litigation. (Defs. Offset Reply Br., at 9.) The language in the Avaya SPD providing for an offset of "other sources of disability income" does not expressly include monies received through litigation settlements. There was nothing in the Avaya LTD Plan or other plan documents that would have notified Morley that settlement proceeds could offset any potential LTD benefit award.

**V. Breach of Fiduciary Duty Claim**
**\*23** The defendants argue that Morley cannot maintain her breach of fiduciary duty claim in Count II of the complaint because she is only seeking relief that is "duplicative of her demand for damages for the alleged wrongful denial of benefits." (Def. Fiduciary Br., at 3.) The defendants also contend that (1) the Avaya LTD Plan cannot be liable for breach of fiduciary duty because it is not a "fiduciary" under ERISA, and (2) if judgment is entered for the defendants on Morley's breach of fiduciary duty claim, the Court should dismiss her other claims against Gates and BCAC for wrongful denial of benefits or disclosure penalties. (*Id.* at 11.)

**A. Potential Liability of the Avaya LTD Plan**
The defendants contend that the Avaya LTD Plan cannot be liable for breach of fiduciary duty because it is not a "fiduciary" under ERISA. (Def. Fiduciary Br.,

at 9.) Morley has withdrawn her request for relief for alleged fiduciary breaches against the Avaya LTD Plan.

**B. Viability of Morley's Breach of Fiduciary Claim Against the Remaining Defendants**
The defendants argue that Morley cannot maintain her breach of fiduciary duty claim in Count II of the complaint because she is only seeking relief that is "duplicative of her demand for damages for the alleged wrongful denial of benefits." (Def. Fiduciary Br., at 3.) Morley contends that she is not seeking duplicative relief; rather, she seeks an equitable declaration in her claim that represents additional relief available to her because of the defendants' fiduciary breaches. Specifically, Morley asserts that she is claiming as additional relief (1) protection from future claim terminations, and (2) interest on delayed benefits. The Court finds that the alleged "additional relief" sought by Morley is available as relief for her wrongful denial of benefits claim.

ERISA states that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). An individual allegedly harmed by a breach of the fiduciary duty described in Section 1104(a)(1) may only seek the relief allowed by Section 1132(a)(3). *Vanity Corp. v. Howe,* 516 U.S. 489, 507 (1996).[FN7] Section 1132(a)(3) provides that a civil action may be brought "by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter (B) to obtain other appropriate equitable relief (i) to redress such violations[,] or (ii) to enforce any provisions of this subchapter." *Id.* Thus, the relief available under Section 1132(a)(3)(B) is limited to "appropriate equitable relief," of which "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.' " *Vanity Corp.,* 516 U.S. at 515; *see McCoy v. Bd. of Trustees of Laborers' Int'l Union Loc. No. 222,* 188

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

F.Supp.2d 461, 472 n. 10 (D.N.J.2002) (granting defendants' motion for summary judgment on breach of fiduciary duty claims and explaining that plaintiff "cannot receive anything in his breach of fiduciary claims that [the court has] not already awarded him under [the plaintiff's] claim for benefits. Equitable relief for a breach of fiduciary duty claim is not appropriate in that circumstance.").

> FN7. As an individual, Morley could not bring a breach of fiduciary duty claim under Section 1109. *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 144 (1985).

**\*24** Section 1132(a)(1)(B) provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* Morley claims that she is seeking equitable relief in the form of protection from future claim terminations. (Pl. Fiduciary Opp. Br., at 7.) However, this form of relief does not constitute "additional relief" otherwise not provided for in Section 1132(a)(1)(B). Instead, this type of relief is *specifically* provided for and contemplated by the language in Section 1132(a)(1)(B).

Morley has also argued that her claim for prejudgment interest on delayed benefits constitutes "appropriate equitable relief" under Section 1132(a)(3). (*Id.* at 7-8.) Morley's reliance on *Fotta v. UMWA Health & Retirement Fund,* 165 F.3d 209, 213 (3d Cir.1998), in support of this contention is misplaced. The *Fotta* court stated that Section 1132(a)(3)(B)-"allowing a beneficiary to sue for 'other appropriate equitable relief ... to enforce any provisions of this subchapter or the terms of the plan' [-] is the appropriate vehicle for such a cause of action." *Id.* However, the Third Circuit later clarified its holding in *Fotta* by explaining that "an ERISA plaintiff who prevails under [Section 1132(a)(1)(B) ] in seeking an award of benefits may request prejudgment

interest under that section as part of his or her benefits award." *Skretvedt v. E.I. duPont de Nemours,* 372 F.3d 193, 208 (3d Cir.2004).[FN8] Therefore, Morley can seek prejudgment interest if she prevails on her claim for wrongful denial of benefits. Accordingly, Morley has not claimed any additional relief under her breach of fiduciary duty claim that she is not otherwise potentially entitled to if she prevails on her wrongful denial of benefits claim.

> FN8. The court went on to say that "[t]o the extent that *Fotta II* discusses a successful ERISA plaintiff needing to use § [1132](a)(3)(B) to 'sue for interest,' in the context of deciding whether a plaintiff who had *not* received an underlying award of benefits under § [1132](a)(1)(B) could still sue for interest on the delayed payment of benefits under § [1132] (a)(3)(B), such statements are *dicta." Id.* at 208 n. 20.

## C. Claims Against Gates and BCAC

The defendants assert that if judgment is entered for the defendants on Morley's breach of fiduciary duty claim, the Court should dismiss her other claims against Gates and BCAC. The defendants claim that the "only entity which can be liable for the alleged wrongful denial of LTD benefits is the Plan itself." (Defs. Fiduciary Br., at 11.) The defendants also argue that the only named defendant that could be held liable for disclosure penalties under Section 1132(c) is the Plan Administrator. (*Id.*) Morley argues that her wrongful denial of benefits claim is viable against BCAC and Gates because (1) Gates participated in processing claimants' payments, and (2) BCAC is "merely an instrumentality of the Plan Administrator." (Pl. Fiduciary Opp. Br., at 8-9.) Morley also, although withdrawing her disclosure penalty claim against Gates, asserts that BCAC is a proper defendant for purposes of that claim. (*Id.* at 9.)

"A plan participant or beneficiary may sue to recover benefits due pursuant to § 1132(a)(1)(B)[;

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

however, [t]he only proper party defendants in such an action ... would be the plan and plan administrator or trustee in his capacity as such." *DeFelice v. Daspin,* No. 01-1760, 2002 WL 1373759, at *6 (E.D. Pa. June 25, 2002). Although the Plan Administrator has delegated BCAC as "the final review committee under the Plan," BCAC is, as Morley admits, "merely an instrumentality of the Plan Administrator." Thus, only the Plan Administrator, Avaya, and the Avaya LTD Plan are proper defendants for Morley's wrongful denial of benefits claim.[FN9]

> FN9. The Court, in granting the defendants' motion for summary judgment on Morley's disclosure penalties, need not address the additional arguments concerning the proper defendants on her disclosure claim. However, the Court notes that for the same reasons mentioned above, BCAC would not be a proper defendant as it is merely an instrumentality of the Plan Administrator, Avaya.

**VI. Scope of the Administrative Record**

**A. Breadth of the Administrative Record**

**\*25** Morley contends that the administrative record should contain all "materials submitted to the Plan Administrator for consideration which [she] had an opportunity to rebut. These items would include all materials submitted by ... Morley to the Plan Administrator from December[ ] 2001 [for BCAC's first review] through [the commencement of the litigation on] January 29, 2004." (Pl. Admin. Rec. Br., at 4.) Thus, Morley argues that the Court should exclude from the administrative record all documents included in the second BCAC review. (Pl. Admin. Rec. Opp. Br., at 2-5; Pl. Admin. Rec. Reply Br., at 2-5.) The defendants contend that the administrative record either contains "all of the documents reviewed by both BCAC Committees (through December 10, 2004), *or* should only include the information before the first

BCAC (April[ ] 2003), from whose denial plaintiff filed her lawsuit." (Def. Admin. Rec. Br., at 4-5 .)

"Under the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed." *Mitchell v. Eastman Kodak,* 113 F.3d 433, 440 (3d Cir.1997) (citations omitted). BCAC denied Morley's appeal through a letter dated April 24, 2003, and approximately 8 months after BCAC denied her appeal, Morley's counsel sent a letter addressed to "Shelley Anderson[,] Secretary, Avaya [BCAC]" dated January 22, 2004, (1) stating that Morley's application for SSD benefits had been approved, (2) enclosing various records regarding her successful SSD application (including a copy of her award check), and (3) requesting that BCAC place the enclosed items into Morley's LTD administrative record. (3-27-06 Vance Certif., at ¶ 4, Ex. C, 1-22-04 Vance Letter to BCAC.) Seven days later, on January 29, 2004, Morley brought this action. (Dkt. entry no. 1.) Avaya sent Morley a letter on August 20, 2004, advising her that BCAC would meet on September 17, 2004, to determine whether to open her claim in light of its receipt of additional medical documentation from her. (Pretrial Ord., at 5-6.) BCAC convened on September 17, 2004, and voted to reopen Morley's claim. *(Id.* at 6.)

The Court finds, as Morley's counsel conceded at oral argument, that Morley continued to pursue administrative remedies through BCAC and Avaya even after bringing this action. (Dkt. entry no. 53.) Morley's counsel submitted medical documentation to BCAC in April and May 2003, and submitted Morley's entire successful social security application to BCAC just seven days before filing the complaint. Morley contends that the second BCAC review was a "sham instituted only for litigation purposes" and "without *any authority.*" (Pl. Admin. Rec. Reply Br., at 2-5; Pl. Admin. Rec. Opp. Br., at 3.) However, BCAC did conduct a second review in which Morley participated, and which presumably could have resulted in an

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

award of LTD benefits to her. Also, BCAC's correspondence to Morley indicates that it determined that it would possibly reopen her claim based on the additional medical documentation that she provided. The parties' dispute over the propriety or rationale for the second BCAC review is a disputed issue of fact that cannot be resolved on a motion for summary judgment. Therefore, as BCAC did conduct two reviews of Morley's LTD benefit claim, the Court finds that the administrative record shall consist of those documents, except for those specifically excluded below, reviewed by both BCAC Committees (or until the second denial on December 10, 2004).

**B. Specific Exclusions**

**1. Dr. Motia's Records**

**\*26** Morley contends that "[a]ny guidance, comments, or information supplied by the BCAC Medical Advisor, Alladin Motia, MD, should not be included in the administrative record." (Pl. Admin. Rec. Br., at 4.) However, Morley fails to identify a single document containing "guidance, comments, or information supplied" by Dr. Motia. Therefore, without listing any documents for the Court to exclude, the Court cannot exclude any such documents from the administrative record.

**2. Dr. Basinger's report**

Morley asserts that Dr. Basinger's report should be excluded because it was not presented to her for rebuttal before bringing this action. Avaya sent Morley a letter dated November 8, 2004, enclosing a copy of Dr. Basinger's report and advising that she had approximately 15 days to respond to the report. (3-20-06 Connelly Cert., at Ex. A.) The Court finds that Morley was presented with a copy of this report, and BCAC considered it in its second review of Morley's claim for LTD benefits. Therefore, the Court will include Dr. Basinger's report in the administrative record.

**3. Records relating to Morley's state court litigation against Avaya**

The parties agree that documents concerning Morley's state court litigation against Avaya should not be included in the administrative record. (Def. Admin. Rec. Opp. Br., at 8; Pl. Admin. Rec. Br., at 4-5.) As such, the Court will exclude these documents from inclusion in the administrative record.

**4. Morley's social security award**

Morley contends that the her social security disability award should be included in the administrative record. Because the Court has determined that the administrative record would include documents presented to Avaya until December 10, 2004, the defendants concede that the social security award should be included in the administrative record. As such, the social security award is included as part of the administrative record.

**5. Proposed Exhibit 11-Picture of nuts and bolts**

The defendants argue that this document, a "photograph of the nuts and bolts apparatus which was apparently installed in [Morley's] back" should be excluded from the administrative record because it was not provided to BCAC for review. (Def. Admin. Rec. Br., at 9.) Morley asserts that this material was available to BCAC "well prior to the filing of" her lawsuit and prior to BCAC's December 2004 meeting. (Pl. Admin. Rec. Opp. Br., at 7.) As there is a genuine disputed issue as to whether this document was provided to BCAC for its review, the Court will defer ruling on this document's inclusion in the administrative record.

**6. Documents related to Morley's disclosure requests**

The defendants claim that proposed exhibits 4, 14, 35-37, 47-48, 98-99, and 134-135, should not be part of the administrative record for purposes of Morley's wrongful denial of LTD benefits claim because the documents relate solely to Morley's disclo-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

sure penalties claim. (Defs. Admin. Rec. Br., at 5-6 & n. 4.) These documents are: (1) BCAC's initial disclosure response by Shelley Anderson (exhibit 4); (2) Morley's December 20, 2002 disclosure request to BCAC (exhibit 14); (3) Morley's December 20, 2002 disclosure request to BCAC with handwritten notations (exhibit 35); (4) correspondence from Vance to BCAC, dated February 3, 2003, regarding the appellate deadline extension (exhibit 36); (5) correspondence from Vance to BCAC counsel, dated January 31, 2003, regarding disclosure issues, with handwritten notations (exhibit 37); (6) by-laws for operation of BCAC (exhibit 47); (7) the professional services contract between Avaya and Gates (exhibit 48); (8) "Opinion 79-82A" (exhibit 98); (9) The Medical Disability Advisor (exhibit 99); (10) "Form 550 Annual Return/Report of Employee Benefit Plan 2001" (exhibit 134); and (11) Application for extension of time to file certain employee plan returns (exhibit 135). (Pretrial Ord., at 28-36.) Morley has not specifically responded to the defendants' arguments regarding the inclusion of these documents. The Court finds that only proposed exhibits 4 and 14 appear on their face to be specifically part of Morley's disclosure penalties claim. The defendants have not shown that the remaining documents are completely unrelated to Morley's wrongful denial of benefits claim. As such, the Court will defer determining whether those documents should be included until trial.

7. Medical reports allegedly not reviewed by BCAC

**\*27** The defendants assert that (1) proposed exhibit 67, an August 11, 2003 report from Karen Schultz, PT, (2) proposed exhibit 77, a May 17, 2004 report from Dr. Rempson, and (3) proposed exhibit 80, an August 9, 2004 report from Dr. Knightly should be excluded from inclusion in the administrative record because there is no evidence that they were presented to BCAC. (Defs. Admin. Rec. Br., at 9.) Morley has not responded to these contentions. The Court cannot find any evidence of record indicating that these documents were produced to BCAC for consideration. Therefore, these documents are excluded from the administrative record.

8. Avaya financial documents

The defendants assert that proposed exhibits 153 through 161, including various financial documents-SEC Form 10-Ks, and Avaya "Stock Quote & History"-were not in the administrative record during either review of Morley's claim for LTD benefits. (Defs. Admin. Rec. Br., at 9.) Morley has not addressed the defendants' arguments for excluding these documents in her briefs. The Court will exclude these documents from the administrative record.

9. Other documents specifically requested to be included by Morley

Morley asserts that the (1) January 23, 2002 operative report completed by Dr. Knightly, (2) January 30, 2002 job description prepared by James Bird of Avaya, (3) March 11, 2004 report of Allyson K. Hurley, DDS, and (4) February 10, 2003 medical report by Donald H. Frank, MD, should be included in the administrative record. The defendants, based in part on the Court's determination as to the breadth of the administrative record, concede that these documents should be included in the administrative record. Accordingly, these documents are included in the administrative record.

10. Documents relating to defenses

The defendants contend that exhibits 132, 133, 141, 142, 144, and 147 through 152, support their various defenses and, as such, should be excluded from the administrative record.[FN10] These exhibits include: (1) Morley's complaint filed in state court against Avaya (exhibit 132); (2) the complaint in this action (exhibit 133); (3) the settlement agreement and general release for the state court action (exhibit 141); (4) print-out of payments of workers' compensation benefits (exhibit 142); (5) Morley's W2 statements (exhibit 144); (6) Morley's answers to interrogatories and requests for admissions (exhibits 147-150); and (7) the defendants answers to interrogatories and requests for admissions (exhibits 151-152). Morley has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

not argued that these documents were part of the administrative record before Gates or BCAC or that they should be included in the administrative record before the Court. The Court will exclude these documents from the administrative record.

> FN10. The defendants' brief states that exhibits 145 and 146 are answers to discovery. (Defs. Admin. Rec. Br., at 5-6 & n. 4.) The Court notes that exhibit 145 is described as an "Appointment of Plan Administrator for Avaya Inc.'s Health and Welfare Plans w/ Exhibit A," and exhibit 146 is listed as "Case Notes of Gates McDonald." (Pretrial Ord., at 37.) Therefore, these documents do not appear to constitute "answers to discovery" and the Court has not considered them as being included in the defendants' request.

### CONCLUSION

The Avaya LTD Plan does not provide conflicting and unambiguous grants of discretion regarding employee plan eligibility between Gates and the Plan Administrator. The Court will (1) deny the part of the cross motion to determine the standard of review insofar as it seeks to have the Court apply a *de novo* standard, and (2) grant the part of the motion to determine the standard of review seeking to have the Court apply an arbitrary and capricious standard of review. The Court finds that there are disputed issues of fact that would possibly justify heightening the applicable arbitrary and capricious standard of review. Therefore, the Court will (1) deny without prejudice the part of the motion seeking to have the Court apply the arbitrary and capricious standard of review without heightened scrutiny, and (2) deny without prejudice the part of the cross motion insofar as it seeks to have the Court apply a heightened arbitrary and capricious standard of review.

**\*28** Morley has failed to demonstrate that she is entitled to disclosure penalties for the Plan Administrator's failure to provide her with a copy of the BCAC

by-laws or the services contract between Gates and Avaya. The defendants have shown that Morley is not entitled to disclosure penalties for the Plan Administrator's failure to turn over those documents because they are not the type of documents required for disclosure under Section 1024(b)(4). The Court will (1) grant the motion for summary judgment on the disclosure claim, and (2) deny Morley's cross motion seeking an award of disclosure penalties.

The Avaya LTD Plan provides for an offset of monies Morley received as part of her social security disability award and temporary workers' compensation. However, the Plan does not provide for an offset of monies Morley received in her settlement in the state court action against Avaya. Also, Morley has not received a determination as to her eligibility for permanent workers' compensation benefits. Accordingly, the Court will (1) grant the part of the motion seeking an offset of (a) social security benefits, and (b) temporary workers' compensation benefits, (2) deny the part of the motion seeking an offset for monies paid to Morley as part of her discrimination lawsuit against Avaya, and (3) deny without prejudice the part of the motion seeking an offset for any award of permanent workers' compensation benefits.

The defendants have shown that Morley's requests for relief under her breach of fiduciary duty claim in Count II of the complaint are duplicative of her potential remedies for the wrongful denial of benefits claim in Count I. Moreover, Gates and BCAC are not proper defendants in the wrongful denial of benefits claim. Thus, the Court will grant the motion for summary judgment on the breach of fiduciary duty claim, and (2) enter judgment in favor of BCAC and Gates on the wrongful denial of benefits claim.

The Court finds that the scope of the administrative record should include all documents presented from the inception of Morley's claim for LTD benefits to the second BCAC Committee's review and denial of her claim on December 10, 2004. The Court will (1)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)
**(Cite as: 2006 WL 2226336 (D.N.J.))**

grant the part of the motion seeking to include all documents reviewed by both BCAC Committees (through December 10, 2004), and (2) deny the part of the cross motion seeking to limit the scope of the administrative record to include only those documents submitted by her from December 2001 (for BCAC's first review) through the commencement of this litigation on January 29, 2004. The Court will also (1) grant the part of the motion seeking to exclude certain documents, including proposed exhibits 4, 14, 67, 77, 80, 132-133, 141-142, 144, and 147-152, and (2) deny without prejudice the part of the motion seeking to exclude proposed exhibits 11, 35-37, 47-48, 98-99, and 134-35. The Court will further (1) grant the part of the cross motion seeking to (a) exclude records relating to Morley's state court litigation against Avaya, and (b) include the (i) January 23, 2002 report of John Knightly, MD, (ii) January 30, 2002 job description prepared by James Bird of Avaya, (iii) March 11, 2004 report of Allyson K. Hurley, DDS, and (iv) February 10, 2003 medical report by Donald H. Frank, MD, (2) deny the part of the cross motion seeking to exclude (a) any "guidance, comments, or information" provided by BCAC Medical Advisor Alladin Motta, MD, and (b) the report of Joseph Basinger, MD, and (3) deny without prejudice the part of the cross motion seeking to include in the administrative record proposed exhibit 11. The Court will issue an appropriate order and judgment.

D.N.J.,2006.
Morley v. Avaya Inc. Long Term Disability Plan For Salaried Employees
Not Reported in F.Supp.2d, 2006 WL 2226336 (D.N.J.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 10

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 2478379 (D.N.J.)
**(Cite as: 2008 WL 2478379 (D.N.J.))**

▷

Only the Westlaw citation is currently available.NOT
FOR PUBLICATION

United States District Court,
D. New Jersey.
Dorena CHANG, Plaintiff,
v.
LIFE INSURANCE COMPANY OF NORTH
AMERICA, d/b/a Cigna Group Insurance, and
SBHCS Benefit Program a/k/a Plan of Our Own,
Defendants.

Civ. No. 08-0019 (GEB).
June 17, 2008.

Bonny G. Rafel, Livingston, NJ, for Plaintiff.

Eric Evans Wohlforth, Gibbons, P.C., Anthony M.
Rainone, Podvey, Meanor, Catenacci, Hildner, Coco-
ziello & Chattman PC, Newark, NJ, for Defendants.

**MEMORANDUM OPINION**
BROWN, Chief Judge.

*1 This matter comes before the Court upon Life
Insurance Company of North America's ("LICNA" or
"Defendant") motion to dismiss Count II of Plaintiff
Dorena Chang's ("Chang" or "Plaintiff") Complaint.
The Court has reviewed the parties' submissions and
decided the motion without oral argument pursuant to
Federal Rule of Civil Procedure 78. For the reasons set
forth below, the Court will grant Defendant's Motion.

**BACKGROUND**

This case arises out of a Complaint filed by Ms.
Chang on January 3, 2008 relating to an award of
disability income benefits pursuant to the SBHCS
Benefit Program (the "Plan"). The Plan provided
long-term disability coverage to Plaintiff and other

employees of Saint Barnabas Health Care Systems.
(Plaintiff's Complaint ("Compl .") at 1.) Plaintiff
contends that she was improperly denied long-term
disability benefits under the Plan and seeks:

(i) an Order directing Defendants to provide her
with benefits and compensate her for past benefits
owed to her (Count I);

(ii) an Order directing the removal of LICNA
from performing fiduciary duties or administrative
duties with regard to the Plan and declaring LICNA to
have breached its fiduciary duties under ERISA
(Count II); and

(iii) an Order for the payment by LICNA of a
penalty pursuant to 29 C.F.R. § 2560.503-1(g) (Count
III). (Compl. at 2, 19-21.)

On February 29, 2008, Defendant filed a motion
to dismiss Count II pursuant to Federal Rule of Civil
Procedure 12(b)(6). Plaintiff opposes the motion.

**DISCUSSION**

**A. STANDARD**

A motion to dismiss under Federal Rule of Civil
Procedure 12(b) (6) may be granted only if, accepting
all well-pleaded allegations in the complaint as true
and viewing them in the light most favorable to the
plaintiff, a court finds that plaintiff has failed to set
forth fair notice of what the claim is and the grounds
upon which it rests. Bell Atlantic Corp. v. Twombly,
---U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d
929 (2007) (citing Conley v. Gibson, 355 U.S. 41, 47,
78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint will
survive a motion under Rule 12(b)(6) if it states plau-
sible grounds for plaintiff's entitlement to the relief

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2478379 (D.N.J.)
**(Cite as: 2008 WL 2478379 (D.N.J.))**

sought. *Id.* at 1965-66 (abrogating *Conley'* s standard that the "complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In other words, it must contain sufficient factual allegations to raise a right to relief above the speculative level. *Id.* at 1965. The issue before the Court "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." *Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (U.S. Jan. 10, 1994) (No. 93-661).

**B. APPLICATION**

**\*2** The ERISA sections at issue in Defendant's motion are set out in 29 U.S.C. § 1132:

(a) Persons empowered to bring a civil action. A civil action may be brought-

(1) by a participant or beneficiary-

(A) for the relief provided for in subsection (c) of this section, or

(B) *to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;* [Section 502(a)(1)(B) ]

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under sec-

tion 409 [29 USCS § 1109];

(3) *by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;* [Section 502(a)(3) ]

29 U.S.C. § 1132 (emphases added).

Defendant contends that Plaintiff may not set forth both a claim for long term disability benefits under ERISA Section 502(a)(1)(B) and a claim of breach of fiduciary duty under Section 502(a)(3). The Supreme Court in *Varity v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) explained that Section 502(a)(3) was a "catchall" provision, serving as a safety net and "offering appropriate equitable relief for injuries caused by violations that Section 502 does not elsewhere adequately remedy." *Id.* at 512. The Court held that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'." *Id.* at 515. Applying this rationale to the facts of that case, the Court held that since Plaintiffs could only rely on Section 502(a)(3) or "have no remedy at all", individual beneficiaries of the employee benefit plan were permitted to seek equitable relief under that section. *Id.*

While the *Varity* opinion has been subjected to varying interpretations, the majority view appears to be the one adopted by Judge Cooper in the case of *Morley v. Avaya, Inc.,* No. 04-409, 2006 U.S. Dist. LEXIS 53720 (D.N.J. Aug. 3, 2006). Plaintiff in that case sought compensation for wrongful denial of benefits and set forth a breach of fiduciary duty claim against the plan administrator. The court reviewed the complaint and granted defendants' motion for sum-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2478379 (D.N.J.)
**(Cite as: 2008 WL 2478379 (D.N.J.))**

mary judgment, deeming that plaintiff's breach of fiduciary duty claim could not stand because it did not "constitute 'additional relief' otherwise not provided for in Section [502(a)(1)(B).]" *Id.* at *24. The court went on to explain that such "relief [wa]s *specifically provided for and contemplated by the language in Section [502(a)(1)(B).]" Id.*

This position was articulated in *Katz v. Comprehensive Plan of Group Ins.,* 197 F.3d 1084 (11th Cir.1999), with the court affirming the district court's dismissal of plaintiff's 502(a)(3) claim on the grounds that plaintiff had an "adequate", overlapping remedy under 502(a)(1)(B), *even though plaintiff ultimately did not prevail on her 502(a)(1)(B) claim. See also Adomaitis v. Alcoa, Inc.,* No. 06-1659, 2007 U.S. Dist. LEXIS 18574 (W.D.Pa. March 15, 2007) (holding that plaintiff could set forth claims under both 502(a)(1)(B) and 502(a)(3), but only to the extent that the 502(a)(3) claims did not overlap with the scope of 502(a)(1)(B)); *Turner v. Fallon Community Health Plan, Inc.,* 127 F.3d 196 (1st Cir.1997) (dismissing plaintiff's Section 502(a)(3) claim because plaintiff sought damages, not equitable relief, and his grievance-a denial of benefits-was specifically addressed by Section 502(a)(1) (B)).

**\*3** Turning to the case at bar, a review of Count II suggests that it is not in fact a request for "additional relief"-i.e. relief not already addressed under Count I and its Section 502(a)(1)(B) claims. Count II demands the following relief:

6. An Order directing the removal of LINA from performing fiduciary or administrative duties with regard to the PLAN and replacing them with an administrator who does not have a conflict of interest in making determinations thereunder.

7. An injunction barring the Defendants from engaging in any further prohibited action under ERISA against CHANG.

8. Declaration of Defendants' noncompliance with the terms of the PLAN.

9. Declaration of Defendants' noncompliance with the minimum requirements of ERISA.

10. Declaration of Defendant LINA's breach of its fiduciary duties under ERISA.

(Compl. at 20.) None of the provisions of Count II seem designed to obtain any additional relief for Ms. Chang beyond: (i) a reversal of the denial of Ms. Chang's benefits and (ii) an assurance that she will be covered under the Plan in the future-both of which are already sought in Claim I and available under Section 502(a)(1)(B) [FN1] Under these circumstances, the Court holds that even viewing all allegations in the light most favorable to Plaintiff, Ms. Chang has failed to set forth sufficient factual allegations to raise a right to relief under Count II above the speculative level.

FN1. Count I claims:

1. An Order directing Defendants to initiate benefits to CHANG under the PLAN.

2. An Order requiring Defendants to award CHANG total disability benefits due and owing her from September 7, 2006 to the present.

3. An Order requiring Defendants to award CHANG all past benefits due to her under the PLAN, with an award of pre-judgment interest without any offset for Social Security benefits.

4. An Order requiring the PLAN to continue to provide to Chang all available benefits she is entitled to as a disabled

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2478379 (D.N.J.)
**(Cite as: 2008 WL 2478379 (D.N.J.))**

employee under the terms of the PLAN, including but not limited to waiver of premiums for her life insurance coverage, pension vesting, LTD survivor benefits and vesting of her 401K benefits if considered disabled.

5. Payment of reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g), costs incurred in this action; and for such other and further relief as the Court deems appropriate.

(Compl. at 19-20.)

The Court is aware that other districts in this Circuit and other courts in this District have interpreted *Varity* differently. The court in *Parente v. Bell-Atlantic,* No. 99-5478, 2000 U.S. Dist. LEXIS 4851 (E.D. Pa. April 18, 2000), for example, held that "[t]he language used by the Supreme Court in Varity does not compel the dismissal of [Section 502(a)(3) ] claims whenever a [Section 502(a)(1)(B) ] claim is also brought," but that it should instead be read to mean that a plaintiff "is only precluded from seeking equitable relief under [Section 502(a)(3) ] when a court determines that plaintiff *will certainly receive or actually receives* adequate relief for her injuries under [Section 502(a)(1)(B) ] or some other ERISA action." *Id.* at *10-11. The court deemed that such a determination was not possible at that stage of the proceedings, and denied defendants' motion to dismiss plaintiff's Section 502(a)(3) claim.

Similarly, the court in *DeVito v. Aetna, Inc.,* 536 F.Supp.2d 523 (D.N.J.2008) held that claims under Section 502(a)(3) are not properly dismissed at the motion to dismiss stage merely because a plaintiff has also brought a claim under Section 502(a)(1)(B). *Id.* at 534. While the court noted the "split among circuits and within this district as to the effect of *Varity* ... on a plaintiff's ability to simultaneously pursue claims for

benefits under § 502(a)(1)(B) and for breach of fiduciary duty under § 502(a)(3)," the Court declared itself "persuaded by the reasoning of those courts that have found that Varity does not establish a bright-line rule at the motion to dismiss stage of the case." *Id* . at *26-27; *see also Roarty v. Tyco Int'l Ltd. Group,* No. 06-195, 2007 U.S. Dist. LEXIS 56637 (D.Del. Aug. 2, 2007) (denying motion to dismiss Section 502(a)(3) claim and arguing that it was too early in the case to assess whether any of the relief sought under the 502(a)(3) claim could lead to any recovery sought by plaintiff under the 502(a)(1)(B) claim).

*4 The Court agrees that *Varity* should not be read as imposing a bright-line prohibition on Section 502(a)(3) claims when Section 501(a)(1)(B) are also set forth. But Plaintiff's Count II appears to be nothing more than an attempt to couch the request for relief it had previously set forth in Count I in the language of equity. To allow Plaintiff to proceed with Count II-including its borderline frivolous request for the removal of LINA from its administrative functions-would lead to a significant waste of the Court's and the parties' resources.

**CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's motion. An appropriate form of Order accompanies this Opinion.[FN2]

> FN2. The Court received a letter dated April 25, 2008 from counsel for the Plan regarding its attempt to join the motion to dismiss discussed above, and a letter from Plaintiff's counsel on the same day arguing that the Plan's motion should be dismissed as untimely. This issue is moot in light of this Court's decision to dismiss Count II.

D.N.J.,2008.
Chang v. Life Ins. Co. of North America
Not Reported in F.Supp.2d, 2008 WL 2478379

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2478379 (D.N.J.)
**(Cite as: 2008 WL 2478379 (D.N.J.))**

(D.N.J.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 11

 LexisNexis®

OUR LADY OF LOURDES HEALTH SYSTEM, Plaintiff, v. MHI HOTELS, INC. HEALTH AND WELFARE FUND and ABC HEALTH AND WELFARE FUND 1-10, Defendants.

Civil No. 09-1875 (JBS/JS)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2009 U.S. Dist. LEXIS 111875*

December 1, 2009, Decided
December 1, 2009, Filed

COUNSEL:  [*1] For **OUR LADY OF LOURDES HEALTH SYSTEM, Plaintiff:** JOHN T. GROGAN, *LEAD ATTORNEY,* BUBB, GROGAN & COCCA, LLP, MORRISTOWN, NJ.

For **MHI HOTELS, INC. HEALTH AND WELFARE FUND, ABC HEALTH AND WELFARE FUND 1-10, Defendants:** JOSEPH F. BOUVIER, *LEAD ATTORNEY,* MATTIONI LTD, SWEDESBORO, NJ.

JUDGES: HONORABLE JEROME B. SIMANDLE, U.S. District Judge.

OPINION BY: JEROME B. SIMANDLE

OPINION

SIMANDLE, District Judge:

This matter is before the Court on Defendant MHI Hotels, Inc. Health and Welfare Fund's motion to dismiss [Docket Item 4], in which Defendant argues that this action is both completely preempted under *§ 502(a)* of the Employee Retirement Income Security Act ("ERISA"), as well as expressly preempted, under *§ 514(a) of ERISA.* Plaintiff Our Lady of Lourdes Health System replies that its claims against Defendant, admittedly an ERISA Plan, arise entirely from third-party contracts executed by the ERISA Plan and independent of the ERISA Plan and so are not preempted by either ERISA provision. For the reasons set forth below, the Court finds that Plaintiff's claims are not subject to complete preemption, but are expressly preempted by *ERISA § 514(a).*

I. BACKGROUND

A. Facts

Plaintiff is a medical services provider that serves, among [*2] others, persons insured by Defendant, a group health care coverage benefits provider. (Compl. at 1.) The parties do not dispute that Defendant is an ERISA employee welfare benefit plan pursuant to *29 U.S.C. § 1002(1).* [1] Plaintiff entered a contract with Intergroup Preferred Network Services, Corp. ("Intergroup") or Beech Street [2] to become a member of a Participating Provider Organization ("PPO") network and to accept discounted payments for group health coverage subject to the conditions in the contract, which included a requirement that discounted payments be made within a certain specified time period. (Compl. at 1-2; Grogan Certification P 5.) Defendant contracted with Beech Street in order to access the discounted rates to be paid to Plaintiff, subject to the conditions of Plaintiff's contract with Intergroup or Beech Street, including the time limit for discounted payments. (Compl. at 2; Grogan Certification PP 4-6.)

1

An ERISA Plan is a legal entity that can sue and be sued. *29 U.S.C. § 1132(d)(1).* Accordingly, the term "Plan" refers not only to the defendant in the underlying lawsuit and the appellee before this Court, but also to the underlying "[r]ules governing collection [*3] of premiums, definition of benefits, submission of claims,

Case 2:13-cv-01472-ES-SCM  Document 6-3  Filed 05/01/13  Page 37 of 73 PageID: 157

Page 2
2009 U.S. Dist. LEXIS 111875, *

and resolution of disagreements over entitlement to services" that make up an employee welfare plan. *Pegram v. Herdrich, 530 U.S. 211, 223, 120 S. Ct. 2143, 147 L. Ed. 2d 164 [] (2000).*

*Pascack Valley Hosp. v. Local 464A UFCW Welfare, 388 F.3d 393, 395 n.1 (3d Cir. 2004).*

2  Plaintiff's complaint alleges that Plaintiff contracted with Beech Street, (Compl. at 1), whereas in its opposition to Defendant's motion to dismiss Plaintiff asserts that it contracted with Intergroup and that Beech Street leased access to Intergroup's contract with Plaintiff, (Grogan Certification P 3). The precise nature of the contractual relationship appears to be irrelevant to this motion to dismiss, for whatever the arrangement, Plaintiff is seeking to enforce the same contract.

For two periods of time, from November 15, 2002 through December 4, 2002, and then from December 17, 2002 through January 31, 2003, Plaintiff provided heath care services to Robert J Giorgi, a subscriber of Defendant's health care plan. (Compl. at 3-4.) The total amounts for services provided to Mr. Giorgi were $ 130,135.00 and $ 490,625. (Id.) Defendant paid $ 15,641.33 and $ 72,450.00, respectively, leaving $ [*4] 113,282.00 and $ 418,175.00 unpaid. (Id.) Plaintiff alleges that Defendant submitted these discounted payments outside the required time period, thereby breaching a condition precedent of their contractual obligation. (Id.) Plaintiff asserts that Defendant has been unjustly enriched to the detriment of Plaintiff and that Plaintiff is entitled to recover the remaining costs of medical service provided to Mr. Giorgi. (Id.)

**B. Procedural History**

On March 19, 2009, Plaintiff brought suit in New Jersey Superior Court, Camden County. On April 20, 2009, Defendant removed the action to this Court, asserting diversity jurisdiction pursuant to *28 U.S.C. § 1332,* and federal question jurisdiction pursuant to *28 U.S.C. § 1331.* Defendant then moved to dismiss asserting complete preemption under *§ 502(a) of ERISA,* as well as express preemption, under *§ 514(a) of ERISA.*

**II. DISCUSSION**

**A. Standard of Review**

In its review of Defendants' motion to dismiss pursuant to *Rule 12(b)(6), Fed. R. Civ. P.,* the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may  [*5] be entitled to relief." *Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)* (quoting *Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).* Thus, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,     U.S.     , 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009);* *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).* Furthermore, "In deciding motions to dismiss pursuant to *Rule 12(b)(6),* courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004)* (citation omitted).

**B. Complete Preemption Under § 502(a)**

ERISA's civil enforcement mechanism,  *§ 502(a),* has "such extraordinary pre-emptive power" that all state law causes of action that are within its scope are completely preempted. *Pascack Valley Hosp. v. Local 464A UFCW Welfare, 388 F.3d 393, 399-400 (3d Cir. 2004)* (quoting *Aetna Health Inc. v. Davila, 542 U.S. 200, 209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)).* In Pascack the Third Circuit outlined the test,  [*6] provided by the Supreme Court in Davila, for determining whether a claim falls within the scope of *§ 502(a).* A claim is completely preempted if (1) the plaintiff could have brought the action under *§ 502(a)* and (2) no other legal duty supports the plaintiff's claim. *Pascack, 388 F.3d at 400.*

The Pascack decision is dispositive as to Defendant's assertion of complete preemption. In Pascack, as here, the plaintiff was a medical services provider seeking to enforce contractual obligations of an ERISA plan. *Id. at 396.* In Pascack, as here, the hospital entered into a contract in which it agreed to accept discounted payment for medical services provided to beneficiaries of group health plans, conditioned on the timely payment of those costs. Id. In Pascack, as here, the ERISA plan entered into a contract binding it to timely payment in order to take advantage of the plaintiff's discounted rates. Id. Finally, in Pascack, as here, the hospital alleged "that the Plan breached this contract by improperly taking a discount on the services provided to [beneficiaries] despite the Plan's failure to make timely payment under the Subscriber Agreement." *Id. at 397.* The Third Circuit concluded that  [*7] the hospital's claim was not completely preempted under *§ 502(a),* first because there was no evidence that the beneficiaries had assigned their *§ 502(a)* claims to the hospital, *id. at 400-02,* and second because the hospital's right to recovery "depend[ed] entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself," *id. at*

402-03. In so finding, the Court of Appeals found significant that the beneficiaries did not appear to be parties to the Subscriber Agreement and that the dispute was not over the right to payment, but the amount of payment, which depended upon the terms of the Agreement. *Id. at 403-04.*

Defendant does not point to any facts that distinguish the present case from Pascack and the Court can find none. Plaintiff's claims similarly arise from the operation of third-party contracts to which the beneficiaries were not a party and the dispute is similarly over the amount of payment as governed by those third-party contracts. It is therefore clear under Pascack that Plaintiff's claim is not completely preempted because it does not satisfy the second *Davila* requirement [3] --Plaintiff's claims are supported by a duty under contract [*8] and not merely *§ 502(a)*. See *Pascack, 388 F.3d at 400, 402-05.* [4]

> 3    Neither party addresses the first prong -- whether Mr. Giorgi assigned his claims under *§ 502(a)* and thus whether Plaintiff could have brought this claim under *§ 502(a)*. Without any information about assignment, the Court will not address this question.
>
> 4    In Pascack, the absence of complete preemption defeated federal jurisdiction and required remand to state court, because the mere possibility of express preemption under *§ 514(a)* did not create a federal question necessary to support jurisdiction under *28 U.S.C. § 1331. 388 F.3d at 398-99.* The fact that Plaintiff's claim is not completely preempted does not defeat federal jurisdiction here, however, because jurisdiction in this case is based on diversity, *28 U.S.C. § 1332,* and not just federal question.

## C. Express Preemption Under § 514(a)

ERISA contains, in addition to its complete preemption power under *§ 502(a),* an express preemption provision. *Section 514(a)* provides, with some exceptions not relevant here, that "the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any [*9] employee benefit plan . . . " *29 U.S.C. § 1144(a).* The Supreme Court has given broad meaning to "relate to," stating: "[T]he phrase 'relate to' [is] given its broad commonsense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987).* The Third Circuit instructs that a state law claim relates to an employee benefit plan if "the existence of an ERISA plan [is] a

critical factor in establishing liability" and "the trial court's inquiry would be directed to the plan." *1975 Salaried Ret. Plan for Eligible Employees of Crucible, Inc. v. Nobers, 968 F.2d 401, 406 (3d Cir. 1992)* (citing *Ingersoll-Rand Corp. v. McClendon, 498 U.S. 133, 139-40, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990)).*

In Nobers, the Third Circuit considered whether a claim by former salaried employees alleging that their employer breached an employment contract that required their demotion to union positions before being laid off was preempted by *§ 514(a). 968 F.2d at 404.* The employees maintained that had they been demoted, as required by their contract, they would have received greater pension and related [*10] benefits than what they were entitled to as salaried employees. Id. The Court of Appeals found that the employees' claims did "relate to" ERISA under *§ 514(a),* because the employees would not have brought suit if the ERISA plan did not exist and a court would have to look to the ERISA plan when calculating damages (even though the employer, not the plans, would have to pay any damages). *Id. at 406.* "In short," the Court of Appeals noted, "if there were no plan, there would have been no cause of action." Id.

Likewise here, Plaintiff would not, and could not, have brought suit without the existence of the ERISA plan. As the Third Circuit in Pascack observed under nearly identical circumstances:

> We have not overlooked the apparent convergence between the Hospital's breach of contract claim and a claim for benefits under *§ 502(a).* Because the Plan is a reimbursement plan, the payments made to the Hospital are the benefits received by [the beneficiaries] under the Plan. As a result, it would appear that any claims the Hospital could have obtained by assignment from [the beneficiaries] would be for the same amount as the breach of contract claims that are the subject of this appeal. Moreover, [*11] had the Hospital successfully sued [the beneficiaries] for the payments due, it would appear that any claims for reimbursement that [the beneficiaries] would have against the Plan would be claims for benefits under *§ 502(a).* Indeed, one of the principal reasons why courts have allowed participants and beneficiaries to assign their claims under *§ 502(a)* is to avoid the necessity of providers suing patients in the first instance.

2009 U.S. Dist. LEXIS 111875, *

*388 F.3d at 404* (emphasis in original). Consequently, while Plaintiff's right to recover may not arise from *§ 502(a)* because of the means that Plaintiff has used to seek relief, the existence of the ERISA plan is essential to this cause of action.

This Court would also be required to direct its inquiry to the ERISA plan. As the Pascack court noted, the amounts sought are those benefits due under the ERISA plan and so, assuming the Court found that Plaintiff had established liability, the Court would necessarily have to find that a certain amount of benefits were owed under the ERISA plan. This is true even if, as Plaintiff argues, the amount were not contested. Such an analysis "goes to the essence of the function of an ERISA plan --the calculation and payment [*12] of the benefit due to a plan participant." *Kollman v. Hewitt Associates, LLC, 487 F.3d 139, 150 (3d Cir. 2007)*; see *Nobers, 968 F.2d at 406.*

Plaintiff argues that its claim does not "relate to" ERISA because its "right to recovery depends entirely on the operation of third-party contracts executed by the ERISA Plan or their agent . . . that are independent of the ERISA Plan itself." The Court does not disagree and has consequently found that this cause of action is not subject to complete preemption under *§ 502(a).* Nevertheless, as reflected in Nobers and Ingersoll, *§ 514(a)* express preemption does not turn solely on the basis for liability or the need to interpret an ERISA plan. The Nobers plaintiffs sought relief under an employment contract independent of any ERISA plan. *968 F.2d at 404.* The Ingersoll plaintiff alleged that he was wrongfully discharged by his employer to avoid paying ERISA benefits -- a claim that did not require looking to the plan terms, conditions, or administration. *498 U.S. at 141.* Yet both claims were preempted, because the existence of the plan was essential to the suit and the courts would have been required to look to those plans to resolve the dis-

pute. *Ingersoll, 498 U.S. at 141*; [*13] *Nobers, 968 F.2d at 406.* As discussed above, a similar analysis would be required here. Thus, under the reasoning in *Pascack*, Nobers, and Ingersoll, Plaintiff's breach of contract claims are expressly preempted by *§ 514(a) of ERISA.* [5]

> 5   Plaintiff relies on several cases outside of this circuit, *Blue Cross v. Anesthesia Care Assocs. Med. Group. Inc., 187 F.3d 1045 (9th Cir. 1999), Foley v. Southwest Tex. HMO, 226 F. Supp. 2d 886 (E.D. Tex. 2002), In re Managed Care Litigation, 135 F. Supp. 2d 1253 (S.D. Fla. 2001), Orthopaedic Surgery Assocs. v. Prudential Health Care Plan, Inc., 147 F. Supp. 2d 595 (W.D. Tex. 2001)*, to support the position that this contract claim is not subject to preemption under *§ 514(a).* To the extent that these cases support such a position, they are inconsistent with the law of this circuit, to which this Court is bound.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion to dismiss on the grounds that Plaintiff's claims are expressly preempted by *§ 514(a) of ERISA,* though the Court finds that Plaintiff's claims are not completely preempted by *§ 502(a).* The Court grants this motion without prejudice to Plaintiff pursuing their ERISA [*14] remedies under the Plan.

**December 1, 2009**

Date

**/s/ Jerome B. Simandle**

JEROME B. SIMANDLE

U.S. District Judge

EXHIBIT 12

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

H

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
SHINN et al.
v.
CHAMPION MORTGAGE COMPANY, INC.

Civil Action No. 09-CV-00013 (WJM).
Feb. 5, 2010.

West KeySummary**Mortgages 266 ⟡216**

266 Mortgages
    266IV Rights and Liabilities of Parties
        266k215 Actions for Damages
            266k216 k. Between Parties to Mortgage or
Their Privies. Most Cited Cases
    Mortgagors alleged facts sufficient to state a
claim for breach of contract against a mortgagee upon
which relief could be granted. The mortgagee's ap-
parent failure to provide an itemized bill, as would
typically be provided in ordinary business circum-
stances when a service is performed, provided a suf-
ficient basis to find that the mortgagee breached the
parties' contractual provision prohibiting the charging
of fees in excess of those actually incurred. Although
the mortgagors did not identify the specific language
of the provision, their allegations that such a provision
existed and that the mortgagee charged excessive fees
were accepted as true.

Lewis G. Adler, Law Office of Lewis Adler, Wood-
bury, NJ, Roger C. Mattson, Woodbury, NJ, for
Plaintiffs.

Diane A. Bettino, Reed Smith, LLP, Pittsburgh, PA,
for Defendant.

WILLIAM J. MARTINI, District Judge.
    *1 Dear Litigants:

    This matter comes before the Court on the Motion
to Dismiss of Defendant Champion Mortgage Com-
pany, Inc. ("Champion"), pursuant to Federal Rule of
Civil Procedure 12(b)(6). Oral arguments were not
held. Fed.R.Civ.P. 78. For the reasons set forth below,
Defendant Champion's motion is **GRANTED** in part
and **DENIED** in part.

**I. BACKGROUND**
    This action arises out of a mortgage loan obtained
by Plaintiffs Stanley and Catherine Shinn ("the
Shinns") from Defendant Champion in 2001. Cmplt. ¶
13. The Shinns are New Jersey residents. Cmplt. ¶ 8.
Champion, a non-depository licensed lender with its
principal place of business in New Jersey, is a division
of Key Bank USA. N.A. ("Key Bank"). Cmplt. ¶¶ 2,
14. Key Bank is a national bank headquartered in
Ohio. Cmplt. ¶ 7. Defendant retained the law firm of
Fein, Such, Kahn, & Shepard ("Fein") as its counsel.
Cmplt. ¶ 3.

    The Shinns' mortgage, obtained for the purchase
of a home in Oaklyn, NJ, was in the amount of
$102,000. Cmplt. Ex. B; *id.* ¶ 1. The mortgage con-
tract was executed on April 23, 2001. Cmplt. ¶ 13. By
October 2004, the Shinns had begun to miss pay-
ments. Cmplt. ¶ 15. On February 22, 2005, Champion
initiated foreclosure proceedings against the Shinns.
Cmplt. ¶ 16. On that same day, Champion also sent
Plaintiffs a letter offering to reinstate the original
mortgage and abstain from going forward with the
foreclosure in exchange for a reinstatement fee in the
amount of $7,981.07 (the "reinstatement fee"). Cmplt.
¶ 17. The reinstatement fee was broken down as fol-
lows: $4,190.55 in principal and interest, $209.55 in
late fees, $377.19 in deferred late fees, $60 in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

non-sufficient fund charges, $550.68 for a corporate advance balance, and $2,593.10 in attorneys' fees and costs. Cmplt. Ex. A. The letter specified that the reinstatement fee would have to be paid by March 7, 2005, or new figures would need to be obtained. *Id.*

On June 22, 2005, Champion sent the Shinns a new letter and contract (the "Forbearance Agreement") adjusting the amount of the required fees to $12,905.24, with a required down payment of $7,000. Cmplt. Ex. B. The document was on Champion letterhead. *Id.* The Forbearance Agreement also clearly states that "Champion Mortgage is a debt collector attempting to collect a debt and any information obtained will be used for that purpose." *Id.* The terms of the Forbearance Agreement were approved by Champion's mitigation loss manager and agreed to by the Shinns. Cmplt. ¶ 19. There are no allegations by any party that the Forbearance Agreement is in default, and according to the Complaint, it has been paid in full. *Id.* There is no additional information about the status of the Shinns' reinstated mortgage.

On January 2, 2009, the Shinns filed a complaint with this Court against Champion and Fein.[FN1] They seek to bring the matter as a class action.[FN2] The Complaint contains ten counts against Champion: (1) breach of contract, (2) negligence, (3) breach of the duty of good faith and fair dealing, (4) unjust enrichment, (5) unfair and deceptive assessment and collection of fees, (6) violation of the Fair Foreclosure Act, (7) violation of New Jersey court rules for attorneys' fees, (8) violation of the New Jersey Consumer Fraud Act, (9) violation of the Truth-in-Consumer Contract, Warranty, and Notice Act, and (10) violation of the Licensed Lenders Act. Specifically, Plaintiffs allege that Champion and Fein "engaged in a uniform scheme and course of conduct to inflate their profits by charging and collecting various fees not authorized by the loan documents or applicable law," including attorneys' fees and costs in excess of those actually incurred. Cmplt. ¶ 20. The Complaint contains few additional or supporting factual details. The gravamen

of Plaintiffs' claims appears to be that Champion overcharged the Shinns in connection with their mortgage and the Forbearance Agreement.

> FN1. Although initially named as a defendant, Fein was dismissed from the action in November 2009.

> FN2. At this juncture, the Court finds that Plaintiffs have sufficiently pled the requirements for federal diversity jurisdiction over a class action lawsuit, in accordance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). CAFA provides that federal jurisdiction exists over a class action in which any one plaintiff is diverse from any one defendant and the aggregate amount in controversy exceeds $5,000,000. The Court is cognizant of exceptions to CAFA, under which a federal court may or must decline jurisdiction depending on how many members of the proposed plaintiff classes are citizens of the state in which the action was filed, if the primary defendant is a citizen of that state as well. Nevertheless, the Court is satisfied that a sufficient number of the members of all proposed plaintiff classes would be domiciled outside the state of New Jersey to meet the requirements, having not seen any allegations or evidence to the contrary. *See Kaufman v. Allstate New Jersey Ins. Co.,* 561 F.3d 144, 153 (3d Cir.2009) (finding that the burden of proving the applicability of a CAFA exception falls upon the party opposing jurisdiction). The Court is also satisfied that a sufficient amount in controversy has been alleged. *See Lamond v. Pepsico, Inc.,* No. 06-CV-3043, 2007 WL 1695401, at *3 (D.N.J. June 8, 2007). No objections to jurisdiction have been raised. However, the Court may decide to further probe diversity and amount in controversy at a later point in time and directs the parties to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

conduct jurisdictional discovery as the case progresses.

## II. ANALYSIS

### A. Standard of Review

**\*2** In evaluating a motion to dismiss under Fed.R.Civ.P. 12(b), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998). When deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears that no relief could be granted "under any set of facts that could be proved consistent with the allegations," a court may dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

Although a complaint does not need to contain detailed factual allegations, "the 'grounds' of [the plaintiff's] 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Thus, the factual allegations must be sufficient to raise a plaintiffs right to relief above a speculative level. *See id.* at 1964-65. Furthermore, although a court must view the allegations as true in a motion to dismiss, it is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual

allegations." *Baraka v. McGreevey,* 481 F.3d 187, 211 (3dCir.2007).

### B. Count I-Breach of Contract

Count I alleges that the mortgage agreement and note contained a provision allowing Champion to be reimbursed only for actual expenses incurred, that Champion has charged Plaintiffs fees in excess of actual expenses, and therefore that Champion violated the terms of the contract. Cmplt. ¶¶ 20, 39, 41. Plaintiffs also allege that Champion failed to disclose in advance additional fees such as a $60 charge for returned checks. Cmplt. ¶ 40. However, Plaintiffs do not cite or allege the existence of any contractual provision requiring such disclosures. Furthermore, Plaintiffs do not attach the note or mortgage, and the Complaint does not provide the specific language of any contractual provisions that were allegedly breached. Rather, the Complaint says only that the loan documents were "standard form notes and mortgages" and that their provisions were "uniform." Cmplt. ¶ 38.

To prevail on a breach of contract claim under New Jersey law, a plaintiff must prove four elements: (1) the existence of a valid contract between plaintiff and defendant; (2) defendant breached the terms of the contract; (3) plaintiff performed its obligations under the contract; and (4) plaintiff was injured as a result of defendant's breach. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 275 F.Supp.2d 543, 566 (D.N.J.2003) (citing *Coyle v. Englander's,* 199 N.J.Super. 212, 223, 488 A.2d 1083 (App.Div.1985)).

**\*3** Here, Plaintiffs' allegations are exceedingly vague, and Plaintiffs' failure to attach copies of the mortgage or note make it difficult for the Court to determine whether a breach has been sufficiently alleged to survive a motion to dismiss. To the extent that Plaintiffs allege breach of contract with respect to Defendant's failure to provide advance notice of fees such as the returned check fee, this claim fails and will be dismissed. Plaintiffs do not allege the existence of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
(Cite as: 2010 WL 500410 (D.N.J.))

any contractual provision requiring advance disclosure of such fees. Without a contractual provision to that effect, there can be no breach. Likewise, to the extent that Plaintiffs allege that Defendant in general breached the Forbearance Agreement, this claim also fails. If Plaintiffs fail to allege the existence of a provision that was breached or specific conduct that constituted the breach, the claim cannot survive.

However, to the limited extent that Plaintiffs allege breach of a contractual provision prohibiting the charging of fees in excess of those actually incurred, Plaintiffs appear to have sufficiently stated a claim for which relief can be granted. Cmplt. ¶ 41. Although Plaintiffs do not identify the specific language of the provision, at this stage in the proceedings, the Court must accept as true Plaintiffs' allegations that such a provision exists and that Defendant charged fees in excess of those incurred. *See Baraka,* 481 F.3d at 211. Plaintiffs also identify a breach of the provision, namely that with respect to attorneys' fees, costs of suit, recording fees, certificate fees, and sheriff's fees, Defendant allegedly charged them amounts higher than those actually expended. Cmplt. ¶ 20. Plaintiffs further allege that they paid Defendant for these excessive charges and that they were harmed in the amount of the difference between the incurred charges and the amount actually charged by Plaintiffs. Cmplt. ¶ 19.

Plaintiffs concede that they cannot ascertain the precise amount that they were overcharged, because Defendant has never provided them with itemized bills. Pl. Br. at 2-3. Nevertheless, Plaintiffs have sufficiently alleged the elements of the cause of action and provided sufficient background facts for this one narrow theory of liability only. Furthermore, the 12(b)(6) motion to dismiss standard requires the Court to use its common sense when deciding whether or not a plaintiff has sufficiently stated a claim for relief. *See Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009) (stating that "[d]etermining whether a complaint states a plausible

claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"); *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The common sense and judicial experience of this Court suggest that in ordinary business circumstances, when a service is performed, it is typically accompanied by an itemized bill, particularly when one is requested. The Defendant's apparent failure to provide an itemization by no means conclusively establishes overcharging or that Defendant cannot justify its fees and expenditures. Nevertheless, at this juncture, it provides a sufficient basis, in conjunction with the above-mentioned reasons, to find that Plaintiffs have sufficiently stated a claim for breach of contract, on this particular theory of liability.

**C. Count II-Negligence**

**\*4** The Complaint alleges that "Champion owed Plaintiffs and other Class members a duty of care with respect to servicing their mortgage loans," that Champion was negligent, and that Plaintiffs have suffered damages as a direct result. Cmplt. ¶¶ 44-47. To state a claim for negligence under New Jersey law, a plaintiff must demonstrate the following: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; (3) injury or harm to the plaintiff; and (4) proximate cause. *Anderson v. Sammy Redd and Associates,* 278 N.J.Super. 50, 56, 650 A.2d 376 (App.Div.1995).

However, it is well settled in New Jersey that this claim is barred by the economic loss doctrine. *See Perkins v. Washington Mutual, FSB,* 655 F.Supp.2d 463, 471 (2009). The economic loss doctrine provides that a tort remedy does not arise from a contractual relationship unless the breaching party owed an independent duty imposed by law. *Saltiel v. GSI Consultants, Inc.* 170 N.J. 297, 316, 788 A.2d 268 (2002); *Perkins,* 655 F.Supp.2d at 471 (finding that the economic loss doctrine barred a negligence claim brought by a plaintiff mortgagor against a defendant mortga-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

gee, because both were parties to the mortgage contract and there was no other duty owed). If a defendant owes a duty of care separate and apart from the contract between the parties, then a tort claim such as negligence may lie. *Saltiel,* 170 N.J. 297 at 314, 788 A.2d 268. However, the mere failure to fulfill obligations encompassed by the parties' contract is not actionable in tort. *Id.* at 316-317, 788 A.2d 268.

Here, Plaintiffs and Defendant were parties to a contract, namely the mortgage and the note. Plaintiffs' claims are based on allegedly improper payments arising out of these contracts, which cannot give rise to a tort remedy. There is no other relationship between the parties. As Defendant argues, relevant authority demonstrates that a bank does not owe a duty of care to a borrower, even if the borrower is a consumer. *See United Jersey Bank v. Kensey,* 306 N.J.Super. 540, 553, 704 A.2d 38 (App.Div.1997). Therefore, the negligence claim fails and must be dismissed.

Plaintiffs argue in their opposition brief that this case "is about more than the loan" and that the "impact to Mr. & Mrs. Shinn concerns their credit worthiness, the emotional upset from Defendants' egregious actions and possible loss of their home in addition to any contract damages." PL Br. at 21. However, courts have routinely rejected this argument. *See Skypala v. Mortgage Electronic Registration Systems, Inc.,* No. 08-CV-5867, 2009 WL 2762247, at *6 (D.N.J. September 1, 2009) (rejecting an identical argument because the court found it incredible that the defendant's alleged overcharging of fees in connection with the curing of the plaintiff's default could have a negative effect on the plaintiff's creditworthiness and because "it is axiomatic that a plaintiff cannot collect contract damages for emotional distress" (citations omitted)); Restatement (Second) of Contracts § 353 and Comment a ("Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely re-

sult.... Damages for emotional disturbance are not ordinarily allowed."). The Court rejects this argument as well. The claim must be dismissed.

**D. Count III-Breach of the Duty of Good Faith and Fair Dealing**
*\*5* Plaintiffs also allege that Defendant breached the duty of good faith and fair dealing. Cmplt. ¶ 51. The duty of good faith and fair dealing is implicit in every contractual relationship in New Jersey. *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244, 773 A.2d 1121 (2001). It operates to ensure that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder, Inc. v. Borden, Inc.* 148 N.J. 396, 420, 690 A.2d 575 (1997). However, as Defendant notes, Plaintiffs have not sufficiently alleged a violation of this duty. Dft. Br. at 22. Indeed, Plaintiffs' Complaint does not identify any fruits of the contract to which they were entitled and with which Defendant interfered. Plaintiffs merely allege that they were overcharged. Therefore, the claim must be dismissed.

**E. Count IV-Unjust Enrichment**
Count IV alleges that Defendant was unjustly enriched at Plaintiffs' expense. Cmplt. ¶ 57. In New Jersey, an unjust enrichment claim requires a plaintiff to allege that (1) at plaintiff's expense, (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it. *In re K-Dur Antitrust Litigation,* 338 F.Supp.2d 517, 544 (D.N.J.2004).

However, as Defendant argues, unjust enrichment is a legal theory providing for recovery only in the absence of a contract. *See Duffy v. Charles Schwab & Co., Inc.,* 123 F.Supp.2d 802, 814 (D.N.J.2000); *Shapiro v. Solomon,* 42 N.J.Super. 377, 383, 126 A.2d 654 (App.Div.1956). When a valid and unrescinded express contract between the parties exists, courts will not permit recovery pursuant to the theory of unjust enrichment. *Ryan v. Federal Express Corp.,* 78 F.3d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

123, 127 (3d Cir.1996).

Plaintiffs present several arguments in opposition to Defendant's position. They argue that their contract claim is not an impediment to their quasi-contract claim because they are permitted to plead in the alternative.[FN3] Pl. Br. at 25. They also assert that Defendant's denial that it breached the contract means that Defendant is liable in quasi-contract. *Id.* Lastly, Plaintiffs argue that in order to dismiss the unjust enrichment claim, "the court must hold as a matter of law that the violations are a breach of contract." *Id.*

> FN3. The Court notes that although Plaintiffs use the terms unjust enrichment, quasi-contract, and implied contract interchangeably, the three concepts are related but not entirely synonymous. *See* Restatement (Second) of Contracts § 4 Comment b (1981); *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionary & Tobacco Workers Int'l Union of Am.,* 28 F.3d 347, 365 (3d Cir.1994); *Terrace v. Williams,* No. 07-CV-099, 2009 WL 2043870, at *11 (V.I. July 1, 2009). Nevertheless, for the purposes of this motion, the Court will construe the meanings of these terms liberally and will deem Plaintiffs' use of any one as encompassing the meanings of all three.

The logic behind Plaintiffs' argument is extremely flawed. Contrary to Plaintiffs' assertions, Defendant does not argue that Plaintiffs' contract claim prevents Plaintiffs from filing a claim for unjust enrichment. What Defendant does argue is that because a valid and unrescinded express contract exists, a fact that Plaintiffs do not meaningfully refute, Plaintiffs are not entitled to recovery under a theory of unjust enrichment. Dft. Br. at 24. This is simply because, given the existence of the express contract, there is no need to resort to alternate theories of recovery. Furthermore, the Court notes that a finding of no liability in contract does not guarantee a finding of liability under an al-

ternative theory such as quasi-contract, nor the other way around.

**\*6** Plaintiffs also argue that, contrary to Defendant's position, recovery in contract and in quasi-contract are not mutually exclusive. Pl. Br. at 25. However, the very case Defendant cites for this proposition states that the existence of an express contract does not preclude the existence of an implied contract only if "the implied contract is *distinct* from the express contract." *See Baer v. Chase,* 392 F.3d 609, 617 (3d Cir.2004) (emphasis added) (stating that the "implied contract, if it is to be valid, must be entirely unrelated to the express contract. The existence of an express contract precludes the existence of an implied contract dealing with the same subject") (internal citations omitted).

Here, although Plaintiffs do not state the nature of the implied contract that they allege, it seems that it would have to cover the very same ground as the express contract if, as Plaintiffs allege, it would prohibit the same conduct. Therefore, the Court finds no need to turn to alternate theories of recovery, because a valid and express contract exists between the parties that governs their rights. This Count must be dismissed.

**F. Count V–Unfair and Deceptive Assessment and Collection of Fees**

Plaintiffs allege that because Champion collected fees that were not permitted by the mortgage contract or by law, Defendant has violated Section 5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a). Cmplt. ¶ 64. While Plaintiffs concede that there is no private right of action under the FTCA, they argue that a violation of the FTCA constitutes a violation of the New Jersey Consumer Fraud Act ("NJCFA") and that there is a private right of action under the NJCFA. Pl. Br. at 26; Cmplt. ¶ 64.

Plaintiffs have not provided any authority in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

support of their contentions that collecting fees in violation of contract or law violates the FTCA or that violations of the FTCA constitute violations of the NJCFA. While the Court is willing to consider a novel argument, Plaintiffs must articulate some sort of rationale for their position. Because Plaintiffs have not provided any sort of reasoning or authority from an analogous point of view whatsoever, their claim fails and must be dismissed.

### G. Count VI–Violation of the Fair Foreclosure Act

In Count VI, Plaintiffs allege that the Fair Foreclosure Act ("FFA"), N.J.S.A. 2A:50-57(b)(3), prohibits the charging of attorneys' fees and costs in excess of those allowed by the New Jersey court rules. Cmplt. ¶ 66. They also allege Champion charged for costs and attorneys' fees in excess of the amount permitted by NJ Rule 4:42-9(a)(4), and that this conduct constitutes an unconscionable business practice under the NJCFA. Cmplt. ¶ ¶ 67-68.

The FFA provides a defaulting mortgagee the right to cure the default and reinstate the mortgage by, among other requirements, paying or tendering court costs and "attorneys' fees in an amount which shall not exceed the amount permitted under the Rules Governing the Courts of the State of New Jersey." N.J.S.A. 2A:50-57(b)(3). The relevant court rule identified by Plaintiffs, NJ Rule 4:42-9(a)(4), provides

*7 *In an action for the foreclosure of a mortgage,* the allowance shall be calculated as follows: on all sums adjudged to be paid the plaintiff amounting to $5,000 or less, at the rate of 3 1/2%, provided, however, that in any action a minimum fee of $75 shall be allowed; upon the excess over $5,000 and up to $10,000 at the rate of 1 1/2%; and upon the excess over $10,000 at the rate of 1%, provided that the allowance shall not exceed $7,500. If, however, application of the formula prescribed by this rule results in a sum in excess of $7,500, the court may award an additional fee not greater than the amount of such excess on application supported by affidavit

of services. In no case shall the fee allowance exceed the limitations of this rule. NJ Rule 4:42-9(a)(4).

Plaintiffs fail to cite any authority demonstrating that charging legal fees in excess of New Jersey court rules violates the NJCFA.[FN4] But even assuming that this is true, Plaintiffs have not demonstrated a violation of the court rules, because NJ Rule 4:42-9(a)(4) governs the fees that can be charged in an action for foreclosure only. The Court does not find that NJ Rule 4:42-9(a) (4) applies to legal fees associated with a forbearance agreement, particularly where the parties have contractually agreed to pay legal fees. See *Amboy National Bank v. Ahmed,* No. L-3051-05, 2007 WL 397055, at *6 (App.Div. February 7, 2007). Here, by the terms of the Forbearance Agreement, Defendant did not go forward with its action for foreclosure and instead the parties reached a settlement. In addition, the Forbearance Agreement stated that Plaintiffs "agreed under the terms of the note and mortgage to pay legal fees and costs [to Defendant] in the event of default."[FN5] After Plaintiffs' default, if Defendant had proceeded with the action for foreclosure, then the court rules would likely have applied. But because the parties settled, the rules do not apply. Thus, to the extent that Plaintiffs allege legal fees charged in connection with the Forbearance Agreement were excessive under the court rules, this claim fails.

FN4. However, Plaintiffs do cite to a case demonstrating that a violation of a rent control ordinance was actionable under the NJCFA. See *Wozniak v. Pennella,* 373 N.J.Super. 445, 862 A.2d 539 (App.Div.2004). This case also states that the NJCFA is very broad and covers so many deceptive practices that they could not all be enumerated. Thus, just because a course of conduct is not specifically prohibited by the statute, that does not mean it does not fall within its scope. Nevertheless, this is too tenuous to establish that violating New Jer-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

sey court rules violates the NJCFA.

> FN5. The Court notes that Plaintiffs' agreement to pay legal fees has no implications on their contract claim. An agreement to pay legal fees is not an agreement to pay excessive legal fees, *i.e.* fees beyond those permitted by the parties' agreement.

**H. Count VII-Violation of New Jersey Court Rules for Attorneys' Fees and Costs**

Plaintiffs allege that Defendant charged attorneys' fees and costs in excess of the amount permitted by NJ Court Rules and that a violation of the NJ Court Rules constitutes a violation of the NJCFA. Cmplt. ¶ 71. As stated above, whether or not a violation of New Jersey court rules constitutes a violation of the NJCFA in the foreclosure context, Plaintiffs have failed to demonstrate a violation of the New Jersey court rules with respect to attorneys' fees here because the relevant court rule applies to foreclosure actions and not to settlements, the situation before this Court. This claim fails for the same reasons as Count VI and must be dismissed.

To the extent that Plaintiffs allege overcharging with respect to costs, in addition to attorneys' fees, this claim fails for identical reasons. The language of Rule 4:42-10(a), governing costs in a foreclosure action, mirrors the language of Rule 4:42-9(a)(4) and states that it applies to "an action for the foreclosure of a mortgage," not to a settlements of an action for the foreclosure of a mortgage.

**I. Count VIII-Violation of the New Jersey Consumer Fraud Act**

**\*8** Plaintiffs allege that "the actions of the Defendants constitute unconscionable business practices in violation of the New Jersey Consumer Fraud Act." Cmplt. ¶ 77. Plaintiffs fail to state which actions constitute unconscionable violations of the act. Even assuming that Plaintiffs' Complaint is speaking to the

alleged overcharging of attorneys' fees and costs in violation of NJ court rules, this claim fails for the reasons stated above in Counts VI and VII and must be dismissed.

**J. Count IX-Violation of the Truth-in-Consumer Contract, Warranty, and Notice Act**

Count IX asserts that Champion violated New Jersey's Truth-in-Consumer Contract, Warranty & Notice Act ("TCCWNA"). Cmplt. ¶ 80. The TCCWNA provides in pertinent part,

> No seller, lessor, creditor, lender or bailee shall in the course of his business ... enter into any written consumer contract ... which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time ... the consumer contract is signed or the warranty, notice or sign is given or displayed. N.J.S.A. 56:12-15.

> A person who violates the TCCWNA is liable for a $100 civil penalty or actual damages, at the election of the consumer. N.J.S.A. 56:12-17.

In general, the TCCWNA prohibits entering into a contract which bargains away legal, but not contractual, rights. Assuming that the mortgage and note are "consumer contracts" to which the TCCWNA applies, Plaintiffs have not identified which provisions of either document allegedly violate a clearly established right of Plaintiffs or responsibility of the relevant defendants, as provided for by law. *See Perkins,* 655 F.Supp.2d 463 at 470 (dismissing a claim brought pursuant to the TCCWNA because the plaintiff failed to identify which provisions of a mortgage or note allegedly violated a right clearly established by positive law as opposed to one established by contract). Therefore, the claims must be dismissed.

**K. Count X-Breach of the Licensed Lenders Act**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

Count X alleged a violation of the Licensed Lenders Act. Plaintiffs concede that this count should be dismissed.

**L. Litigation Privilege**

Defendant raises the argument of litigation privilege and argues that it bars Plaintiffs' entire Complaint. Dft. Supp. Br. at 1. The litigation privilege is a well-established New Jersey doctrine that protects all statements made by attorneys or parties during the course of judicial or quasi-judicial proceedings. *Ruberton v. Gabage,* 280 N.J.Super. 125, 133, 654 A.2d 1002 (App.Div.1995). Defendant asserts that the litigation privilege applies to all statements made by Defendants with respect to Plaintiffs' foreclosure and settlement procedures, such that the entire case cannot proceed. Dft. Supp. Br. at 1.

New Jersey courts have established that the litigation privilege applies to any communication (1) made injudicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. *Hawkins v. Harris,* 141 N.J. 207, 216, 661 A.2d 284 (1995). The privilege is broadly construed and extends to statements made during settlement proceedings. *Rickenbach v. Wells Fargo Bank,* N.A. *et al.,* 635 F.Supp.2d 389, 401 (D.N.J.2009); *Loigman v. Twp. Comm. of Twp. of Middletown,* 185 N.J. 566, 587, 889 A.2d 426 (2006). Although it was initially meant to apply only to defamation and related causes of action, it has been applied to foreclosure proceedings and settlements as well. *Rickenbach,* 635 F.Supp. at 401; *Ogbin v. Citifinancial Mortg. Co.,* No. 09-CV-0023, 2009 WL 4250036, at *7 (D.N.J. November 19, 2009).

*\*9* Defendant relies on the premise that Plaintiffs' entire action arises out of the Forbearance Agreement, such that most if not all of the supporting evidence would be privileged. This is simply not true. Plaintiffs' claims are inextricably linked to the original mortgage

and note, which were drafted significantly prior to the commencement of any judicial proceedings and would not fall under the privilege's scope. Even the claims which appear to be based on the Forbearance Agreement (overcharging of attorneys' fees post-default) are also based on the mortgage and note, because the Forbearance Agreement merely reiterated Plaintiffs' obligations with respect to attorneys' fees established in the mortgage and note. It does not appear that any claims are based solely on documents created during the pendency of judicial or quasi-judicial proceedings.

Moreover, even if there were certain claims that were affected by the privilege, they would not be barred outright. At most, the privilege would prevent the admissibility of certain documents at trial, such as the Forbearance Agreement or the letter containing the first reinstatement fee. However, whether or not enough evidence would exist without those documents to prove Plaintiffs' claims is not a question to be decided at this juncture. Therefore, the Court finds that the litigation privilege has no effect on Plaintiffs' claims at this stage in the proceedings.

**M. Voluntary Payment Rule**

Defendant also raises the voluntary payment rule, arguing that it prevents Plaintiffs from bringing their Complaint. Dft. Br. at 12. Under this rule, when payments are made "under a mistake of law or in ignorance of law, but with full knowledge of the facts," those payments cannot be recovered absent a showing of fraud, duress, or improper conduct on the part of the payee. *In re Resorts, Inc.,* 181 F.3d 505, 511 (3d Cir.1999).

Although Plaintiffs have not alleged duress, they most certainly do allege fraud. Cmplt. ¶ ¶ 64, 68, 77. Moreover, because Defendant never itemized the charges, it does not appear to the Court that Plaintiffs had full knowledge of the facts when they made payments to Defendant. Pl. Br. at 2-3. Additionally, to the extent that Defendant charged Plaintiffs for expenses beyond those actually incurred, Plaintiffs cer-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)
**(Cite as: 2010 WL 500410 (D.N.J.))**

tainly did not have full knowledge of the facts. Thus, the voluntary payment rule might defeat claims alleging charges that exceeded statutory limitations, because any recovery would be due to Plaintiffs' mistake of law. However, the Court has already found alternate grounds upon which to dismiss those claims. The voluntary payment rule would not affect Plaintiffs' ability to recover fees paid that exceeded contractual limitations, because Plaintiffs were also operating under a mistake of fact that was allegedly propagated by Defendant.

**N. Entire Controversy Doctrine**

Finally, Defendant asserts that Plaintiffs' action is barred by the entire controversy doctrine. Dft. Br. at 8-9. The entire controversy doctrine requires parties to fully litigate all aspects of a dispute in a single legal proceeding including all purported claims, counterclaims, and crossclaims. *See Rycoline Prods. v. C & W Unlimited,* 109 F.3d 883, 887 (3d Cir.1997); *Kaselaan & D'Angelo Assocs., Inc. v. Soffian,* 290 N.J.Super. 293, 299, 675 A.2d 705 (App.Div.1996). It applies not only to claims that were fully litigated but to those that settled as well. *Id.*

**\*10** Defendant argues that any disputes with respect to fees and costs charged should have been raised during the foreclosure and settlement procedures. Dft. Br. at 12. The problem with this argument is that the alleged misconduct did not occur until the Forbearance Agreement was signed and Defendant enforced its terms by collecting the allegedly improper fees from Plaintiffs, at which point there was nothing that could be done except bring an additional action. Therefore, the Court finds that the entire controversy doctrine does not present a bar to Plaintiffs' action.

**III. CONCLUSION**

For the reasons stated above, Defendant's Motion to Dismiss is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** as to Counts II-X and **DENIED** as to Count I. Counts II-X are **DISMISSED WITH PREJUDICE,** as the Court finds that

amendment would be futile. Count I remains, although it has been limited to the single theory of liability identified above. An appropriate order follows.

D.N.J.,2010.
Shinn v. Champion Mortg. Co., Inc.
Not Reported in F.Supp.2d, 2010 WL 500410 (D.N.J.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 13

Westlaw.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.
CJS CORPORATE CENTER, LLC, Plain-
tiff-Appellant,
v.
MERRILL LYNCH MORTGAGE LENDING, INC.
and Douglas P. Shelley, Vice President, Merrill Lynch
Mortgage Lending, Inc., Defendants-Respondents.

Argued Jan. 21, 2010.
Decided July 2, 2010.

West KeySummary**Mortgages 266 ☞211**

266 Mortgages
   266IV Rights and Liabilities of Parties
      266k211 k. Dealings and transactions between
parties. Most Cited Cases

**Mortgages 266 ☞306**

266 Mortgages
   266VII Payment or Performance of Condition,
Release, and Satisfaction
      266k306 k. Change in time or mode of pay-
ment. Most Cited Cases
    Lender did not act in bad faith by changing initial
proposed loan terms upon exercising due diligence.
The borrower sought to secure a refinanced mortgage
loan on a building he owned. However, in a couple of
years, most of its tenants would be vacating. In order
to avoid potential losses, the lender requested that the
borrower issue a letter of credit which would require

him to pay a tenant improvement and leasing reserve
to be used to cover re-leasing costs in case the tenants
did not renew their leases, but the borrower refused to
do so. The application form clearly stated that the
proposed terms were subject to due diligence findings.
Moreover, the new terms offered by the lender were
not unreasonable.

On appeal from Superior Court of New Jersey, Law
Division, Monmouth County, Docket No. L-2236-07.
Dennis A. Collins argued the cause for appellant
(Collins, Vella & Casello, LLC, attorneys; Mr. Col-
lins, of counsel; Matthew K. Kalwinsky, on the brief).

Joel A. Siegel argued the cause for respondents.

Before Judges PAYNE, MINIMAN and WAUGH.

PER CURIAM.
   **\*1** Plaintiff CJS Corporate Center, LLC (CJS),
appeals the dismissal of its complaint seeking dam-
ages from defendants Merrill Lynch Mortgage Lend-
ing, Inc. (Merrill), and Douglas P. Shelley, one of
Merrill's vice presidents. We affirm with respect to
CJS's claim for consequential damages arising out of
Merrill's refusal to lend, but remand to the Law Divi-
sion for further proceeding and possible trial of CJS's
claim for a refund of its deposits for certain costs
related to its loan application.

I.
   We discern the following facts and procedural
history from the record.

A.
   Because we are reviewing a dismissal on sum-
mary judgment, we relate the facts in the manner most
favorable to CJS. Brill v. Guardian Life Ins. Co. of
Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). How-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))**

ever, we note certain disputed issues of fact for the sake of completeness.

CJS owns and operates a 30,000-square-foot commercial building on Route 34 South in Farmingdale. The building also serves as CJS's principal place of business. It has five other tenants, one of which is CJS Investments, Inc., the parent company of CJS.

Scott Caruso is an owner and managing member of CJS. According to Caruso, CJS started seeking a lender to refinance the mortgage on its building in January 2007. Prior to that time, Caruso, who has an M.B.A. and a J.D., had been involved in other commercial financial transactions in the range of $900,000 to $12,200,000. They included the original loan for CJS's building, as well as other commercial buildings in which he had a partial ownership interest.

Caruso and CJS had engaged in refinance negotiations with JPMorgan, its existing lender, GE Capital, and GE Finance over a period of two to three months in late 2006 and early 2007, but the negotiations had not advanced beyond the discussion stage and no formal loan applications had been made. According to Caruso, the best proposal prior to CJS's involvement with Merrill had come from JPMorgan, which proposal consisted of an interest rate "146 points over a ten-year treasury" and a ten-year balloon, with amortization based on a thirty-year period.

On February 1, 2007, Shelley contacted Caruso, seeking prospective borrowers on behalf of Merrill, his new employer. Shelley had previously solicited business from CJS, and had also acted as a mortgage broker for Caruso in connection with the refinancing of his home. However, after Shelley had failed to secure financing for Caruso's home from several banks, Caruso obtained his mortgage elsewhere. At his deposition, Caruso said that his prior experience did not deter him from considering further involvement with Shelley because he was then employed by

Merrill and was no longer a sole practitioner.

Caruso told Shelley that CJS had already requested quotes from other lenders, but Shelley responded that he could quickly provide Caruso with "the terms of a type of loan that [Merrill] could offer ." Caruso outlined CJS's desired terms, including "the balloon term, the interest rate, the approximate principal that was being discussed, [and] ... the amortization term." With the help of Michael Glackin, the CJS controller, Caruso answered Shelley's questions about the building.

**\*2** According to Caruso, "[t]he rental terms[, i.e. the length of the tenant leases,] were specifically discussed [with Shelley] that day because ... [those terms had resulted in] negative feedback ... from other lending institutions." Caruso maintains that he told Shelley that CJS's lease with its parent expired in 2014, which meant that there were seven years remaining at that time. The leases for the four tenants not related to CJS were for five-year terms and would expire in 2009, but they contained options for five-year renewals. Shelley, on the other hand, maintains that Caruso told him that the leases for the four other tenants were for ten-year terms.

The record contains an e-mail sent by Shelley to Caruso at 7:11 p .m. that evening, in which Shelley asked a number of questions, including the following question about the leases: "[W]hat are the start dates for each of the tenants ... I think you said leases are all 10 years with 10% bumps in August 2009." Caruso's responding e-mail did not address the term of the leases, but stated only the start dates of the tenants. Caruso acknowledged at his deposition that it would be "fair to conclude that if Mr. Shelley was under the impression, mistaken or otherwise, that [Caruso's] clients had 10-year leases, that [Caruso's] response would have left him with that impression[.]"

Caruso, Glackin, and Shelley also discussed the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))**

amount of gross rent CJS received from its tenants and the amount of reserves required for tenant improvements. According to Shelley, "reserves are an element of the loan which assures the lender [and others] that money is set aside by the borrower to cover the various listed contingencies. The reserves may be used by the borrower to address the contingencies as they arise." However, "reserves remain the borrower's property, subject to the lender's security interest."

JPMorgan had required CJS to reserve $3,000 dollars a month in tenant improvement and replacement reserves, with an overall cap of $150,000. CJS was seeking a substantially lower rate on reserves because the building was "brand-new" and still under warranty.

Caruso maintained that he was "very up front" with Shelley during the course of their discussions and e-mails, telling Shelley that he needed a "serious commitment." Shelley told Caruso that he would take the information and respond within twenty-four hours, assuring him that Merrill would be able to meet CJS's desired time frame, which was to close on the loan within forty-five days from their initial discussion.

Caruso acknowledged that there were no binding promises made during the call, and that Shelley only made the assurance that "he would do everything possible and [that Shelley gave Caruso] an indication that he felt it was a slam dunk...." Caruso then stated that, as a result of that conversation, he had promised Shelley that he would "not go forward with any lending institution until [Shelley] got back to [him], giving him a few days to do so."

**\*3** Merrill sent CJS a loan application on February 5, 2007. It proposed a $5,000,000 refinance mortgage loan, with a ten-year term and thirty-five year amortization. The loan would be non-recourse except for certain specified events, with an adjustable interest rate equal to the greater of (1) 125 basis points over the treasury rate, (2) seventy-four points above the appropriate Swap rate, or (3) six percent.

The application states:

Conditions Precedent to Loan Commitment: A loan commitment may be issued only upon (1) Lender's receipt of all information requested by Lender, (2) Lender's review and approval of all such information and completion of its due diligence, and (3) approval of Lender's credit committee.

The application also set forth that it "is provided for discussion purposes only and does not constitute commitment to lend or an agreement to issue a commitment."

With respect to required deposits and fees, the application had the following provisions: (1) "[a] $5,000 non-refundable application fee shall be payable upon execution" of the application; (2) a $15,000 good faith deposit "to cover Lender's out-of-pocket expenses"; and (3) a $15,000 legal deposit "to cover Lender's legal expenses." Under the descriptions of the good faith and legal deposits, the application notes that the applicant was also to be responsible for additional out-of-pocket and legal expenses that were not covered by those deposits. Towards the end of the application, the following appeared:

By signing below, Applicant authorizes Lender to apply the Deposits against any fees or expenses incurred or paid by Lender in connection with processing and underwriting the proposed financing, including, without limitation, property inspection fees, travel expenses, fees for appraisal, environment and building condition reports ..., lien search fees and legal fees.

The application contained provisions for three different reserves that would be required, a completion/repair reserve, a replacement reserve and a tenant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))**

improvement and leasing reserve, but did not specify their amounts. The application also contained a section for special conditions: (1) giving borrower the "option for a 60 day Early Rate Loan subject to Lender approval of Borrower Financials;" (2) "Loan proceeds are subject to a sufficient appraisal indicating competitive market vacancy of 5%, rents at the subject property to be at or below market, and an appropriate valuation;" and (3) "CJS Investments shall extend its lease through 2019." The application did not mention any requirement involving a letter of credit from CJS to be retained by Merrill until other tenant leases were renewed.

After receiving the application, Caruso sent questions to Shelley about the reserve analysis and whether the $35,000 fee was refundable if the loan did not proceed. Caruso's letter sent via e-mail on February 5, states:

> With respect to your fees, I want to make sure that the Commitment Deposit is a refundable fee. It is my assumption that it is nothing more than an additional good faith deposit which will be refunded to my company at the time that the loan closes, assuming that there are no overages of your professional's expenses. Should this be the case, then it will be in line with the other lending institutions.

**\*4** Shelley's e-mail response, sent that same day, contained several brief responses to Caruso's questions. The only response to the deposit inquiry was that "[t]he commitment deposit is refundable at closing."

Caruso's letter also contained an inquiry about the reserves, noting that CJS "would like to get a better handle on what is customarily charged by [Merrill]. Furthermore, because we are a new building, there should be no completion/repair reserves required." Shelley's e-mail response stated that he would "expect the replacement reserves to be $.20 [per square foot]

per year. This number is based on the engineering report." According to Caruso, Shelley had given "satisfactory" responses to his questions.

On or about February 6, 2007, CJS submitted the mortgage application to defendants. CJS provided defendants with the required $35,000 for the fee and deposits. Caruso acknowledged at his deposition that the fee and deposits were detailed in the application, and that when he signed the application, he understood and agreed to its terms. Caruso stated that it was his understanding that if the loan closed, the $5,000 would be non-refundable and that the $15,000 good faith deposit would be returned unless CJS terminated the process. Caruso also stated that, at the time of signing, he understood the agreement to mean that the $15,000 legal deposit would not be utilized by Merrill until the loan was approved. Caruso acknowledged that CJS was free to walk away from negotiations with Merrill at any time, but that doing so would result in forfeiture of the application fee.

Shelley's certification states that after the application was submitted, Merrill proceeded with due diligence by collecting building and financial information from CJS, which it supplied to its independent third-party appraiser, CB Richard Ellis (CBRE). Upon receipt of CBRE's formal appraisal on or about March 6,

> [Merrill's] underwriting department determined that because of the extremely high rollover of tenants in [CJS's] building, a loan commitment could not be issued without [CJS] providing a letter of credit to be held by the lender until the leases were renewed by existing tenants or made with new tenants, together with tenant improvement and leasing reserves totaling approximately $2.00 per square foot per year.

Consequently, the reserves would approximately be $60,000 per year, or $5,000 per month.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))**

According to Shelly, the amount of reserves was based on the projected costs to be incurred for tenant improvement and leasing commissions over the ten-year term of the loan. The total projected costs were $1,067,874. Shelley's certification notes that, considering that amount on a yearly basis ($106,787.40), Merrill was only charging 56% of the projected costs. Shelley sent Caruso those additional terms on or about March 9, 2007.

In an e-mail to Caruso dated March 15, 2007, Shelley wrote that Merrill would also require a letter of credit in the amount of $550,000, which would be returned to CJS once at least three tenants renewed their leases. Shelley's certification states that Merrill's underwriting department concluded that the letter of credit and the reserves were "necessary in order for the loan to meet secondary market conditions ... [and that if the loan] could not meet [such] conditions, it could not be submitted to or approved by Merrill's credit committee."

**\*5** Caruso e-mailed Shelley on March 15, stating that, given the amount of reserves and the letter of credit requirement, the terms of the loan were unacceptable to CJS. Caruso went on to state that, "[b]ecause of the departure from the original loan proposal, [CJS is] asking that [the] entire application fee be refunded immediately ." Caruso also asked that Merrill reimburse CJS for the more than $4,000 in attorneys' fees it had incurred in connection with the application. Shelley responded that Merrill would be able to return the remaining deposited funds and offered to send CJS the third-party reports and appraisal in exchange for a release.

Caruso confirmed the termination of CJS's application in an e-mail dated March 16, reiterating that CJS wanted a full refund. Caruso acknowledged in his deposition that Merrill offered to return $10,000 of CJS's deposits if CJS signed a release.

In April 2007, CJS resumed negotiations with JPMorgan and GE Capital. Caruso asserted that CJS had to start "from scratch" soliciting quotes, and that JPMorgan was unwilling to give CJS the same rate it had offered during the prior negotiations. CJS eventually refinanced with GE Capital, submitting an application letter on July 23, 2007. GE Capital required that Caruso and his brother personally guarantee the loan. The loan was for twenty-five years with an interest rate of 6.96%.

**B.**

CJS filed suit against Merrill and Shelley in May 2007, alleging causes of action sounding in breach of contract, negligent misrepresentation, deceit and fraud, intentional interference with business relations, promissory estoppel, equitable estoppel, and misrepresentation. It sought $430,187.60 in damages and counsel fees. The parties engaged in discovery.

Merrill and Shelley moved for summary judgment on December 10, 2008. Following oral argument on February 6, 2009, the motion judge granted the motion:

There are no questions of fact in this whatsoever. Nobody's going to argue any questions of fact. Whether [the leases were] five years or ten years, or five years plus five years, it doesn't matter. It's clear that the application was just that. And this language is crucial to my decision.

"This application letter is provided for discussion purposes only and does not constitute a commitment to lend or an agreement to issue a commitment. Its terms are not inclusive, not all inclusive, and are subject to the lenders credit committee approval, as well as satisfactory secondary market conditions."

This is not a homeowner who's never seen a business. This guy is a sophisticated businessman.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))

And he's an attorney too, right?

[DEFENDANTS' COUNSEL]: That's correct, Your Honor.

THE COURT: Okay. "Additions and changes may be made as the lender and its counsel deem necessary, prudent or desirable." Once you say that you've got to know that, look, anything can happen. And he says he read this....

This guy is going in with eyes open. ["]A commitment may be issued only after lender's receipt review and approval of all of the required information set forth in the attached application, the completion of the lender's due diligence, and approval of the lender's credit committee.["]

*6 Okay, they did it. They did what they were supposed to do. They said, look, we're not going to lend this guy $5 million unless we check it out first. Makes perfect sense. When they check it out they see that, my goodness, ... in two years, he could end up with 85 percent of his tenants gone. They may re-up, but we don't know if they will or not.

And the deal was, ..., if the tenants re-up then you don't need the letter of credit and those reserves, correct?

[DEFENDANTS' COUNSEL]: We would not need the letter of credit.

THE COURT: Okay.

[DEFENDANTS' COUNSEL]: Reserves are always negotiable. I mean, that's the nature of loans.

THE COURT: Okay, but you wouldn't need that big letter of credit, if [the tenants] re-up.

[DEFENDANTS' COUNSEL]: You would not. Yes, that's correct.

THE COURT: That's what I thought. I read that somewhere. So that's what it was. They say, look, we've got to make sure that we've got this guy, these tenants in there for 10 years. And if we don't, we're in deep trouble. Because we know that his office is there, that's not going to be a big cash flow help. So we want to make sure.

So they did a letter, their due diligence. They said, look, we can't do it unless you give us a letter of credit. You give us a tenant improvement and leasing reserves, which basically, as I said before, means hey, if they move out, you have to fix the place and we have to redo it to suit the new tenant. You have to advertise. We have to get a broker to re-rent it, and that's going to cost money. We want money there to make sure we get new tenants in. Perfectly reasonable.

And then, well why should we pay it, is the plaintiff's position. Well, here's why you should pay it. Because you agreed to pay it. "By signing below, applicant authorizes lender to apply the deposits against any fees or expenses incurred or paid by lender in connection with processing and underwriting the proposed financing, including without limitations, property inspection fees, travel expenses, fees for appraisal, environmental and building condition reports, and seismic study if applicable, liens, search fees and legal fees." That's why he has to pay it, because he agreed to pay it.

He went in with his eyes open. He read this, he understood it. There are no questions of fact. The motion is granted.

The order of dismissal was entered the same day. This appeal followed.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))

## II.

An appellate court reviews a grant of summary judgment using the same standard that governs the trial court. *Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.,* 189 N.J. 436, 445-46, 916 A.2d 440 (2007). Generally, the court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party." *Brill, supra,* 142 N.J. at 540, 666 A.2d 146; *see also R.* 4:46-2(c). However, a " 'genuine' issue of material fact" does not exist if there is only one "unavoidable resolution of the alleged disputed issue of fact." *Ibid.* (citation omitted).

### A.

**\*7** There was no breach of the contract with respect to the proposed loan. [FN1] The essence of the motion judge's decision granting summary judgment is that CJS applied to Merrill to refinance the mortgage for its commercial real estate knowing that the application itself provided that it was "for discussion purposes only" and did "not constitute [a] commitment to lend or an agreement to issue a commitment." CJS also knew, again from the clear and specific language of the application itself, that a "loan commitment may be issued only upon (1) [Merrill]'s receipt of all information requested by [Merrill], (2) [Merrill]'s review and approval of all such information and completion of its due diligence, and (3) approval of [Merrill]'s credit committee."

> FN1. We will address the issue of the deposit below.

After obtaining additional information and doing its due diligence, Merrill proposed specific additional loan terms that CJS found unacceptable. As we held in *National Community Bank of New Jersey v. G.L.T. Industry,* 276 N.J.Super. 1, 4, 647 A.2d 157 (App.Div.1994): "The very nature of an application and appraisal process is to explore, not necessarily to

cement, the possibility of a viable loan.... Every courtship does not lead to marriage. Every refinancing application does not guarantee acceptance." *See also Int'l Minerals & Mining Corp. v. Citicorp N. Am., Inc.,* 736 F.Supp. 587, 595 (D.N.J.1990) ("[A] proposal to agree in good faith to consider a loan is not tantamount to an agreement to lend money.").

CJS sought to avoid the clear import of the language of the application it submitted, and our holding in *National Community Bank,* by premising defendants' liability on other legal theories. We hold that those efforts must fail as a matter of law.

CJS contends that there are material issues of fact relating to whether Merrill and Shelley breached the implied covenant of good faith and fair dealing. "A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244, 773 A.2d 1121 (2001). The Supreme Court has held that, for a claim for breach of this covenant, " 'bad motive or intention' is vital," and that "[t]he party claiming a breach ... 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.' " *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,* 182 N.J. 210, 224, 864 A.2d 387 (2005) (quoting 23 *Williston on Contracts* § 63:22 (Lord ed.2002) (footnotes omitted)).

Our review of the record reveals the existence of no such evidence. A motion for summary judgment can be defeated by genuine issues of material fact that, if decided in the non-moving party's favor, would give rise to legitimate inferences supporting the non-moving party's position, but it cannot be defeated by mere speculation. *See Bello v. Lyndhurst Bd. of Educ.,* 344 N.J.Super. 187, 196, 781 A.2d 70 (App.Div.2001).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))**

**\*8** Although the parameters of the terms suggested by Shelley during his discussions with Caruso and contained in the loan application were different in significant respects from those eventually offered by Merrill, Merrill clearly had the right to modify its loan proposal after engaging in its review of the underlying facts and due diligence. That process is established by the application document itself.

CJS argues that Merrill acted in bad faith by trying to cover up Shelley's purported misunderstanding with respect to the term of the tenant leases. In doing so, CJS appears to argue that, as a matter of law, Merrill had no right to change its proposal upon discovering such a mistake or misunderstanding. That argument is inconsistent with Merrill's right to perform due diligence to ensure that Merrill had a complete and accurate understanding of the facts. In addition, CJS's assertion is not legally supported by the case cited, <u>Addesa v. Addesa,</u> 392 <u>N.J.Super.</u> 58, 74, 919 A.2d 885 (App.Div.2007), which is a matrimonial case involving a property settlement agreement. We know of no cases supporting CJS's argument.

There is no evidence to suggest that Merrill's proposal was commercially unreasonable or, more importantly, that Merrill acted with the required bad faith in proposing modified terms after fully examining the information supplied by CJS. Indeed, CJS withdrew its application before any further negotiations of terms could take place between Merrill and CJS.

There can have been no binding oral contract for the making of the refinance loan because such contracts must be in writing pursuant to <u>N.J.S.A.</u> <u>25:1-5</u>(f), which applies to "contract[s] ... to loan money ... in an amount greater than $100,000, not primarily for personal, family or household purposes, made by a person engaged in the business of lending or arranging for the lending of money or extending credit." CJS's reliance on <u>McBarron v. Kipling Woods, L.L.C.,</u> 365 <u>N.J.Super.</u> 114, 838 A.2d 490 (App.Div.2004) is misplaced. That case involved the sale of real property, as to which the Statute of Frauds, <u>N.J.S.A.</u> 25:1-13, has been modified to require either a writing or proof of an oral agreement by clear and convincing evidence. Because there has been no similar amendment to <u>N.J.S.A.</u> 25:1-5(f), <u>McBarron</u> is simply inapposite, and an oral agreement, even if proven by clear and convincing evidence, is not binding in a case such as this one.

The remaining issues raised on appeal do not warrant extended discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). We add only the following.

We see no evidence in the record that would support any allegation sounding in fraud, which involves misrepresentation of past or existing facts, as opposed to predictions of the future, and reasonable reliance on such misrepresentations. <u>Int'l Minerals and Mining Corp., supra,</u> 736 <u>F.Supp.</u> at 598 (applying New Jersey law). At oral argument before us, CJS conceded that it was not alleging that Merrill and Shelley sought submission of the application merely to obtain the application fee and deposits without any intention of ever making a loan. We discern no evidence in the record to support such an assertion. And, given the language of the loan application as outlined above, there could have been no reasonable reliance on any oral representation or statement that a loan would be made.

**\*9** For the same reasons, CJS's claims sounding in promissory and equitable estoppel must fail. See <u>Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank,</u> 163 <u>N.J.Super.</u> 463, 479, 395 A.2d 222 (App.Div.1978) (noting that promissory estoppel requires reasonable reliance), <u>certif. denied,</u> 79 <u>N.J.</u> 488, 401 A.2d 243 (1979); <u>Miller v. Miller,</u> 97 <u>N.J.</u> 154, 163, 478 A.2d 351 (1984) (noting that equitable estoppel requires reasonable reliance); <u>Fairken Assocs. v. Hutchin,</u> 223 <u>N.J.Super.</u> 274, 280, 538 A.2d 465 (Law Div.1987) (same).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)
**(Cite as: 2010 WL 3075694 (N.J.Super.A.D.))**

CJS cannot bring a claim for negligent misrepresentation because "a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." _Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 316, 788 A.2d 268 (2002). See also Int'l Minerals and Mining Corp., supra, 736 F.Supp. at 597,_ in which the district court granted the lender's motion for summary judgment because the lender owed no independent duty to the prospective borrower outside the loan application. CJS has demonstrated no factual or legal basis for a finding that any such independent duty existed in this case.

**B.**

We depart from the motion judge's decision only with respect to the narrow issue of the return of the deposits, particularly the deposit for legal services. We have concluded that a remand is necessary for either further motion practice or a trial with respect to whether CJS is entitled to the return of some or all of its deposits. Although the application fee is clearly not refundable, we do not see evidence in the record to support a determination that CJS is not entitled to a full accounting of the expenditures of the deposited funds and the return of funds that were either not spent at all, or not appropriately and reasonably spent, by Merrill under the terms of the application.

**III.**

For the reasons stated above, we affirm the judgment on appeal as to all issues except the claim for the return of the deposits made by CJS. As to that issue, we reverse and remand to the trial court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

N.J.Super.A.D.,2010.
CJS Corporate Center, LLC v. Merrill Lynch Mortg. Lending, Inc.

Not Reported in A.2d, 2010 WL 3075694 (N.J.Super.A.D.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 14

From: evan kilianski
Sent: Wednesday, May 01, 2013 3:51 PM
To: John Neuwirth; Susan Teixeira; Diane Hall
Subject: RE: United Water - C██ B██

Good afternoon John:

There was no appeal for the claim in question.

You indicate to send the "screen shot." I don't reference one. Do you mean the attachment that is referenced? If so, that is attached.

Thanks,

Evan Kilianski
Star Representative
National Accounts Division
evan_kilianski@horizonblue.com<mailto:evan_kilianski@horizonblue.com>
1-888-400-8533 ext 73392
Fax: 1-973-274-4372

APR-12-2013  14:14                                                                                                P.01/01

ROLLEE NAME - ████ B█████
NTRACT # - 342N186620200
TIENT # - B█████

AIM NUMBER
TE OF SERVICE
PE OF SERVICE
OVIDER NAME

| | AMOUNT BILLED | AMOUNT APPROVED | DEDICTIBLE AMOUNT | COPAY AMOUNT | COINS. | SANCTIONS | AMOUNT PAID | PAYEE DATE PAID CHECK # |
|---|---|---|---|---|---|---|---|---|
| '29/10-08/29/10 SPITAL SERVICES / TIENT CARE ASSOCIATES LLC | $12,430.00 | $703.00 | N/A | N/A | N/A | N/A | $703.00 | ENROLLEE 07/12/10 N/A |
| '23/10-08/23/10 SPITAL SERVICES / TIENT CARE ASSOCIATES LLC | $12,430.00 | $175.75 | N/A | N/A | N/A | N/A | $175.75 | ENROLLEE 07/12/10 N/A |
| '23/10-08/23/10 SPITAL SERVICES / TIENT CARE ASSOCIATES LLC | $4,101.00 | N/A | N/A | N/A | N/A | N/A | N/A | N/A 07/12/10 N/A |

MESSAGES: THIS SERVICE IS NOT PAID. THIS SERVICE IS INCIDENTAL TO A PROCEDURE THAT HAS ALREADY BEEN PROCESSED FOR THIS DATE OF SERVICE. (U749)

EXHIBIT 15



CENTER FOR SPECIAL PROCEDURES, individually and as assignee of PA-TIENTS 1 -- 50, Plaintiff, v. CONNECTICUT GENERAL LIFE INSURANCE COMPANY, d/b/a CIGNA, et al., Defendants.

CIVIL ACTION NO. 09-6566 (MLC)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2010 U.S. Dist. LEXIS 128289*

**December 6, 2010, Decided**
**December 6, 2010, Filed**

**NOTICE:**   NOT FOR PUBLICATION

**COUNSEL:**   [*1] For CENTER FOR SPECIAL PROCEDURES, individually, and CENTER FOR SPECIAL PROCEDURES as assignee of Patients 1-50, Plaintiff: ANDREW JOSEPH KARCICH, JOANNE ESKIN SUTKIN, LYNCH, KARCICH & YELLIN, VOORHEES, NJ.

For CONNECTICUT GENERAL LIFE INSURANCE COMPANY, doing business as CIGNA, CIGNA HEALTHCARE OF SOUTHERN NEW JERSEY, CIGNA HEALTHPLAN OF NEW JERSEY, INC., Defendants: ERIC EVANS WOHLFORTH, JENNIFER MARINO THIBODAUX, GIBBONS, P.C., NEWARK, NJ.

**JUDGES:** MARY L. COOPER, United States District Judge.

**OPINION BY:** MARY L. COOPER

**OPINION**

**MEMORANDUM OPINION**

   **COOPER, District Judge**

   Plaintiff, Center for Special Procedures ("Plaintiff"), commenced this action against Connecticut General Life Insurance Company, d/b/a Cigna, Cigna Healthcare of Southern New Jersey, and Cigna Healthplan of New Jersey, Inc. (collectively, "Defendants"), both on its own behalf and, alternatively, as assignee of patients ("Patients 1-50") insured by Defendants to whom Plaintiff rendered surgical services. (Dkt. entry no. 20, 2d Am. Compl.) Defendants removed the action pursuant to *28 U.S.C. § 1441*, on the basis that the Court has original subject matter jurisdiction pursuant to *28 U.S.C. § 1331* because Plaintiff's claims challenge the denial of benefits [*2] under health benefits plans governed by the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001, et seq.* (Dkt. entry no. 1, Rmv. Not. at 2.)[1]

> 1   Defendants also alleged the existence of jurisdiction pursuant to *28 U.S.C. § 1332* because the parties are citizens of different states and the amount in controversy exceeds $75,000. (Rmv. Not. at 2.)

   Defendants now move to dismiss Count 1 through Count 9 and Count 11 of the Second Amended Complaint for failure to state a claim upon which relief can be granted, pursuant to *Federal Rule of Civil Procedure ("Rule") 12(b)(6)*. (Dkt. entry no. 22, Mot. to Dismiss.) Defendants contend, inter alia, that the state law claims are preempted by ERISA. (Dkt. entry no. 22, Defs. Br. at 5-14.) The Court decides the motion on the papers, pursuant to *Rule 78(b)*. For the reasons set forth below, the Court will grant Defendants' motion to dismiss Count 1 through Count 9 and 11.

**BACKGROUND**

   Plaintiff is an ambulatory surgery center that provided surgical services to Patients 1--50 on an "out-of-network" basis as a "non-participating provider." (2d Am. Compl. at ¶¶ 9, 14.) Plaintiff has identified 38 insurance plans as governing the services rendered   [*3] to Patients 1-50. (Id. at ¶ 11.) Of these 38 plans, it appears that three are exempt from the provisions of

2010 U.S. Dist. LEXIS 128289, *

ERISA ("non-ERISA plans"), and 35 are ERISA plans. (Id. at ¶¶ 12-13.)

Plaintiff alleges that it called Defendants to confirm that Patients 1-50 each had out-of-network benefits that would cover services rendered by Plaintiff, and Defendants confirmed that such coverage existed. (Id. at ¶ 15.) Plaintiff received an assignment of benefits from Patients 1-50 assigning "all medical and/or surgical benefits" to Plaintiff. (Id. at ¶¶ 19-20.) Although Defendants had allegedly made payments for services prior to February 16, 2009, after that date, when Plaintiff submitted claims for payment to Defendants, "individually as a service provider and alternatively as assignee of the patients," Defendants denied the claims and refused to pay. (Id. at ¶¶ 22-28.) The apparent basis for this refusal is that Plaintiff "is not licensed [with the New Jersey Department of Health] as an ambulatory care facility." (Id. at ¶ 29.)

Plaintiff contends that Defendants' refusal to pay is in violation of state and federal law. The Second Amended Complaint contains eleven counts, listed here as they appear in   [*4] the pleading:

> Count 1: Breach of Contract
>
> Count 2: Unjust Enrichment & Quantum Meruit
>
> Count 3: Third Party Beneficiary
>
> Count 4: Implied Contract, Contract by Custom or Dealing, Implied Covenant of Good Faith and Fair Dealing
>
> Count 5: Reasonable Reliance, Arbitrary and Disparate Treatment
>
> Count 6: Tortious Interference
>
> Count 7: Negligent Misrepresentation
>
> Count 8: Arbitrary and Capricious
>
> Count 9: Promissory Estoppel
>
> Count 10: ERISA -- Payment of Benefits Due -- Violation of *ERISA [§] 502(a)(1)*
>
> Count 11: ERISA - Violation of Fiduciary Duty and $110 Per Day Penalty

(2d Am. Compl. at 11-37.) With the exception of Count 10, each count is asserted as to both the ERISA plans and the non-ERISA plans at issue, "to the extent allowable at law." Plaintiff asserts Count 10 as to the ERISA plans only, and solely in the capacity of the as-

signee of Patients 1-50. (2d Am. Compl. at ¶¶ 172-173, 179-180.) The remaining claims are asserted alternatively in Plaintiff's own right and as assignee of Patients 1-50, designated by Plaintiff as "non-derivative claims" and "derivative claims," respectively. (Pl. Br. at 2.)[2]

> 2    Only Count 1, Count 2, and Count 5 expressly state that the cause of action is based on, alternatively,   [*5] Plaintiff's assignee status and on its own behalf as a provider of services. (2d Am. Compl. at ¶¶ 62-63, 80-81, 112-113.)

Defendants contend that Count 1 through Count 9, as state law claims, are preempted by ERISA as to the ERISA plans, and further contends that Count 1 through Count 9 and Count 11 should be dismissed as to all plans for failure to conform to the pleading standard articulated in *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).* (Defs. Br. at 2-3.) Plaintiff opposes the motion. (Dkt. entry no. 23, Pl. Br.)

The Court determines the motion on the papers, pursuant to *Rule 78(b)*. For the foregoing reasons, the Court will grant the motion.

**DISCUSSION**

**I. 12(b)(6) Motion to Dismiss Standard**

In addressing a motion to dismiss a complaint under *Rule 12(b)(6)*, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).* At this stage, a "complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is   [*6] plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 556).* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--that the 'pleader is entitled to relief.'" *Iqbal, 129 S.Ct. at 1950* (quoting *Rule 8(a)(2)).*

In evaluating a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the Court may consider the complaint, exhibits attached thereto, matters of public record, and undisputedly authentic documents if the claimant's claims are based upon those documents. See *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).*

## II. ERISA Preemption

### A. Express Preemption

ERISA contains a broad preemption clause providing that ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." *29 U.S.C. § 1144(a); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44-45, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987).* [*7] With this provision, Congress intended:

> to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government . . . , and to prevent the potential for conflict in substantive law . . . requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

*N.Y. Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656-57, 115 S. Ct. 1671, 131 L. Ed. 2d 695* (internal citations and quotations omitted); *see Kollman v. Hewitt Assocs., LLC, 487 F.3d 139, 148 (3d Cir. 2007).*

The express preemption clause is not limited to "state laws specifically designed to affect employee benefit plans." *Pilot Life, 481 U.S. at 47-48* (quoting *Shaw v. Delta Airlines, 463 U.S. 85, 98, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983)).* The term "relate to" has been construed broadly to preempt a broad range of state law claims. *See Ingersoll-Rand Corp. v. McClendon, 498 U.S. 133, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990)* (state law tort and breach of contract theories preempted by ERISA); *Pilot Life, 481 U.S. at 43-44, 47* (breach of contract, breach of duty, and fraud claims preempted [*8] by ERISA); *Pryzbowski v. U.S. Healthcare, 245 F.3d 266, 278 (3d Cir. 2001)* (negligence claim preempted by ERISA); *Pane v. RCA Corp., 868 F.2d 631 (3d Cir. 1989)* (breach of contract and bad-faith insurance practices claims preempted by ERISA); *Schmelzle v. Unum Life Ins. Co. of Am., No. 08-0734, 2008 U.S. Dist. LEXIS 63627, at *8-9 (D.N.J. July 31, 2008)* (breach of contract, breach of fiduciary duty, fraud, and negligence claims preempted by ERISA); *Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc., No. 06-928, 2007 U.S. Dist. LEXIS 61137, 2007 WL 2416428, at *7 (D.N.J. Aug. 20, 2007)* (claims by out-of-network provider assignee for unjust enrichment, tortious interference, and fraud expressly preempted by ERISA); *Majka v. Prudential Ins. Co. of Am., 171 F.Supp.2d 410, 413 (D.N.J. 2001)* (breach of contract and breach of the implied duty of good faith and fair dealing preempted by ERISA); *Alston v. Atl. Elec. Co., 962 F.Supp. 616, 624 (D.N.J. 1997)* (breach of contract, negligent misrepresentation, and fraud claims preempted by ERISA).

To decide whether a plaintiff's state law claims are expressly preempted, a court must first determine whether the plan at issue is an ERISA benefit plan. *See Pane v. RCA Corp., 667 F.Supp. 168, 170 (D.N.J. 1987),* [*9] aff'd, *868 F.2d 631 (3d Cir. 1989).* A court must then analyze whether the state law claims "relate to" that plan. Id.

The parties do not dispute that 35 of the 38 plans at issue here are ERISA plans. *See 29 U.S.C. § 1002(1)* ("any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, . . . for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care of benefits. . . .").[3] Defendants do not argue that Count 1 through Count 9 are preempted by ERISA as to the three non-ERISA plans. (Defs. Br. at 2.)

> 3    Plaintiff states that it "believes that there may be more than three (3) non-ERISA plans" and requests that any order of the Court dismissing Plaintiff's claims as preempted by ERISA "reflect that all plans ultimately determined to be non-ERISA plans are not preempted." (Pl. Br. at 8.) Given that Defendants provided the cover page for the summary plan descriptions for each of the 38 plans at issue to Plaintiff and included them as an exhibit to the motion to dismiss, we find no basis for Plaintiff's "belief" that some of the plans beyond the three specified non-ERISA plans are exempt [*10] from ERISA. (Id.; Defs. Br., Ex. A; 2d Am. Compl. at ¶¶ 11-13.) See *29 U.S.C. § 1003(b)* (listing plans exempt from ERISA coverage).

We find that Count 1 through Count 9 of the Second Amended Complaint, insofar as they are asserted as to the ERISA plans, are expressly preempted by ERISA because they "relate to" Defendants' administration of the ERISA plans. Each of these state law causes of action clearly "relate to," in that they have a "connection with or reference to," the ERISA plans, because they are all rooted in the premise that Defendants should have remitted payment to Plaintiff for services Plaintiff rendered to persons covered by the plans. *Pane, 667 F.Supp. at 171;* see *Pryzbowski, 245 F.3d at 278* (noting that "suits against . . . insurance companies for denial of benefits, even when the claim is couched in terms of common law negligence or breach of contract, have been held to be preempted by" *29 U.S.C. § 1144(a)).* Reference to the

plans is necessary because no contract existed as between Defendants and Plaintiff as a non-participating, out-of-network provider to govern the parties' obligations. Accordingly, Count 1 through Count 9 will be dismissed as to the ERISA plans.

## B.   [*11] Complete Preemption

ERISA's civil enforcement provision, *29 U.S.C. § 1132(a)*, has been found to evince Congressional intent to completely preempt state law remedies and make the ERISA civil enforcement remedy exclusive as to plans governed by ERISA. See *Pilot Life, 481 U.S. at 54-57*. The statute provides that a civil action to enforce ERISA may be brought by, inter alia, "a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *29 U.S.C. § 1132(a)(1)(B)*.[4]

> 4      The remaining provisions, *29 U.S.C. § 1132(a)(2)-(10)*, are not relevant here.

Insofar as Plaintiff asserts that it pleads various state law claims in a "non-derivative" capacity, i.e., on its own behalf rather than as assignee of Patients 1-50, such claims are preempted by ERISA's exclusive civil enforcement remedy because they amount to claims for unpaid benefits, and Plaintiff in its "non-derivative" capacity is neither a plan participant nor a beneficiary. (See Pl. Br. at 1-2.) *Aetna Health Inc. v. Davila, 542 U.S. 200, 209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)* ("[A]ny state-law cause of action that  [*12] duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."). Thus, the claims insofar as they are asserted in Plaintiff's "non-derivative" capacity shall be dismissed.

## III. *Rule 8(a)*

Defendants contend that the Court should dismiss Count 1 through Count 9 and Count 11 because the Second Amended Complaint does not set forth sufficient facts showing that Plaintiff is entitled to relief. (Defs. Br. at 15 (citing Twombly); dkt. entry no. 26, Def. Reply Br. at 5.) The Court considers each Count in turn.

### A. Count 1 - Breach of Contract

Count 1 of the Second Amended Complaint alleges that "Defendants are in breach of the applicable insurance agreements and plans with Plaintiff's Patients 1-50"; Plaintiff has demanded payment of the claims due and owing to it under the insurance agreements and plans individually as a services provider or, alternatively, as assignee of Patients 1-50; and Defendants have denied

payment. (2d Am. Compl. at ¶¶ 61-64.) It further alleges that Defendants denied payment on the basis Plaintiff is not licensed as an ambulatory care facility, and that [*13] this denial is contrary to "summary plan descriptions" ("SPDs") and Defendants' past practices. (Id. at ¶¶ 66-70.)

Defendants contend that Count 1 must be dismissed because Plaintiff failed to identify the contractual provisions at issue. The Court agrees. Plaintiff's factual allegations regarding the provisions of the SPDs are vague and stated in the alternative: "The SPDs do not prohibit payment of Services at 'unlicensed' ambulatory care facilities. . . . Alternatively, the SPDs are ambiguous regarding licensure." (2d Am. Compl. at ¶¶ 71-72.) The Second Amended Complaint does not state the actual terms or provisions Defendants have allegedly breached, but merely concludes that "Defendants' refusal to pay" is "contrary to the SPDs." (2d Am. Compl. at ¶¶ 67-69; see also id. at ¶ 70 ("The SPDs do not prohibit payment to Plaintiff under the circumstances herein and to the contrary, the SPD summaries and/or schedules of benefits indicate coverage exists.") (emphasis added).)

"It is axiomatic that contract-based claims that do not adequately identify the contract at issue fail to 'set forth fair notice' of a claim and the 'grounds upon which it rests' and do not 'raise a right to relief  [*14] above the speculative level.'" *In re Samsung DLP Television Class Action Litig., No. 07-2141, 2009 U.S. Dist. LEXIS 100065, 2009 WL 3584352, at *6 (D.N.J. Oct. 27, 2009)* (quoting *Twombly, 550 U.S. at 555*). Insofar as Count 1 asserts a breach of contract based on Patients 1-50's insurance plans, it must be dismissed for failure to state a claim.[5]

> 5      Plaintiff's opposition to dismissal of Count 1 on the basis that it is also asserting breach of "unwritten" contracts, in the form of Defendants' discontinuation of a previous course of dealing with Plaintiff, is misplaced, as Plaintiff separately pleaded causes of action relating to that theory. (Pl. Br. at 14-15.)

### B. Count 2 - Unjust Enrichment and Quantum Meruit

Count 2 seeks recovery of the reasonable value of services provided by Plaintiff to Patients 1-50, based on Defendants' alleged "direct verbal confirmation that each patient had out of network benefits" for such services, inducing Plaintiff to provide those services. (2d Am. Compl. at ¶¶ 80-84.) Plaintiff contends that Defendant has therefore been unjustly enriched by retaining funds that otherwise should have been paid to Plaintiff for "covered out of network Services rendered to Patients 1-50." (Id. at ¶ 86.)

This [*15] claim, like Count 1, is based primarily on the written insurance plan contracts between Patients 1-50 and Defendants. Plaintiff has alleged that it is the assignee of the benefits engendered to Patients 1-50 by reason of their insurance plans. (2d Am. Compl. at ¶¶ 19-20, 81 (asserting Count 2, in the alternative, in the capacity as assignee of the Patients).) Recovery under an unjust enrichment or a quantum meruit theory is unavailable where an express agreement exists, and therefore Plaintiff's claim as assignee of benefits takes precedence over its "non-derivative" basis for the claim, which is not predicated on an express contract. (Cf. Pl. Br. at 15.) Because Defendants apparently do not challenge the validity of the Patients' assignments of benefits to Plaintiff, nor do Defendants dispute the existence of the insurance plans, this theory of recovery is unavailable to Plaintiff. See *Van Orman v. Am. Ins. Co., 680 F.2d 301, 310 (3d Cir. 1982)* ("[R]ecovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties."); *Moser v. Milner Hotels, Inc., 6 N.J. 278, 78 A.2d 393, 394 (N.J. 1951)* (holding that a plaintiff pleading existence of an express [*16] contract cannot recover in quasi-contract without showing a rescission, because an express contract excludes an implied one). Defendants' motion to dismiss will be granted as to Count 2.

### C. Count 3 - Third Party Beneficiary

Count 3 alleges that Plaintiff was a third party beneficiary of the insurance plan contracts between Patients 1-50 and Defendants, and contends that as the third party beneficiary, Plaintiff was "entitled to pursue and receive payment for Services rendered to Patients 1-50 from Defendants." (2d Am. Compl. at ¶¶ 91-94.) Defendant contends that this claim is redundant to Plaintiff's breach of contract claim, and should be dismissed, like Count 1, for insufficient factual allegations regarding the alleged contractual provisions. (Defs. Br. at 17.) Plaintiff responds that Count 3 is not redundant because "Plaintiff is a third party beneficiary by assignment and statute." (Pl. Br. at 16 (citing provisions of ERISA and *McGoldrick v. Trueposition, Inc., 623 F. Supp. 2d 619, 634-35 (E.D. Pa. 2009)* (discussing standing of alleged beneficiary of ERISA plan to recover statutory penalty provided at *29 U.S.C. § 1132(c)(1)*)).)

As discussed above, this claim is preempted as to the [*17] ERISA plans. With regard to the non-ERISA plans, Count 3 suffers the same infirmity as Count 1 in that the pertinent contractual provisions alleged to have been breached are not sufficiently set forth. Moreover, Count 3 is redundant to Count 1 in the sense that Plaintiff's breach of contract claim arises from its status as a third party beneficiary, which Plaintiff has standing to pursue by virtue of the assignments from Patients 1-50.

See *Zahl v. Cigna Corp., No. 09-1527, 2010 U.S. Dist. LEXIS 32268, 2010 WL 1372318, at *1-2 (D.N.J. Mar. 31, 2010)*. Accordingly, Count 3 will be dismissed.

### D. Count 4 - Implied Contract, Contract by Custom or Dealing, Implied Covenant of Good Faith and Fair Dealing

Count 4 asserts that Plaintiff and Defendants had a course of dealing from August 2008 to February 16, 2009, during which Defendants paid Plaintiff for services it provided to various patients who were Defendants' insureds or plan members. (2d Am. Compl. at ¶ 99.) Plaintiff contends that this course of conduct "constituted an implied promise to continue payment" for such services, and that Defendants breached this promise by refusing to pay "without good cause and in bad faith." (Id. at ¶¶ 101-02.)

Defendants argue that [*18] the claims in Count 4 "are just reiterations of its breach of contract claim," noting that, "as with the breach of contract claim, no specific contract term is identified, even one that might have been established by a course of dealing." (Defs. Br. at 17-18.)

The Second Amended Complaint does not set forth any facts that would allow the Court, or Defendants, to discern the alleged terms of Defendants' "promise and/or contract to pay." (2d Am. Compl. at ¶ 102.) Instead, Count 4 consists of the type of "the-defendant-unlawfully-harmed-me" accusations the Supreme Court stated would not pass muster on a motion to dismiss in *Iqbal, 129 S.Ct. at 1949*. Accordingly, the Court will dismiss Count 4.

### E. Count 5 - Reasonable Reliance, Arbitrary and Disparate Treatment

Plaintiff contends in Count 5 that Defendant violated the "implied contract between the parties" by refusing to pay for services rendered after February 16, 2009, and allege that this conduct was contrary to Defendants' course of conduct with other similarly situated medical providers, in that Defendants did not stop paying for services rendered by those other providers on the basis that the providers' facilities were not licensed. [*19] (2d Am. Compl. at ¶¶ 114-19.)

The Court has already noted that Plaintiff has not stated a cause of action for breach of contract, implied or otherwise. Insofar as Count 5 purports to assert causes of action for "reasonable reliance" and "arbitrary and disparate treatment," they are derivative of Plaintiff's breach of contract claims, and accordingly will also be dismissed for failure to state a claim.

### F. Count 6 - Tortious Interference

Count 6 alleges that Defendants interfered with Plaintiff's right to engage in prospective economic relationships with patients, by "refusing intentionally and maliciously to pay for Services rendered by Plaintiff to Defendants' insureds or plan members, Patients 1-50." (2d Am. Compl. at ¶¶ 133-35.) Plaintiff contends that Defendants' refusal "to pay for Plaintiff's Services to Patients caused the loss to Plaintiff of the anticipated economic benefits of the relationship, thus causing injury and damage to Plaintiff." (Id. at ¶ 137.)

To plead a cause of action for tortious interference with prospective economic advantage, a plaintiff must set forth facts alleging (1) "some protectable right -- a prospective economic or contractual relationship," (2) the interference [*20] was done intentionally and with malice, (3) the interference caused the loss of the prospective gain, and (4) the injury caused damage. *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 563 A.2d 31, 37 (N.J. 1989). It is "'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship. . . . Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law." *Id. at 37-38.*

Because Defendants are party to the contractual relationship giving rise to the claims here-- namely, the insurance plans--Defendants are not subject to a claim for tortious interference with prospective economic advantage. Count 6 will therefore be dismissed as to all plans.

## G. Count 7 - Negligent Misrepresentation

Plaintiff alleges in Count 7 that "Defendants negligently misrepresented to Plaintiff that Plaintiff would be paid for Services rendered to Patients 1-50." (2d Am. Compl. at ¶ 142.) Specifically, Plaintiff contends that in "telephone conversations between Plaintiff's representatives and Defendants' representatives," Defendants' [*21] representatives advised that "facility fees for outpatient pain management injections performed at an ambulatory surgical center were covered Services and that there was out of network coverage for same as to each of Plaintiffs 1-50." (Id. at ¶ 143.)

To state a claim for negligent misrepresentation, a plaintiff must show "[a]n incorrect statement, negligently made and justifiably relied on," proximately causing an economic loss. *Konover Constr. Corp. v. E. Coast Constr. Servs. Corp.*, 420 F.Supp.2d 366, 370 (D.N.J. 2006). The misrepresentation must be made by a person with a duty to the plaintiff. *Roll v. Singh*, No. 07-4136, 2008 U.S. Dist. LEXIS 50125, 2008 WL 3413863, at *20 (D.N.J. June 26, 2008). Even where a plaintiff properly

pleads these elements, however, a negligent misrepresentation claim must fail if it is "not the type of case where a negligent misrepresentation claim is appropriate," i.e., "tort claims by innocent third parties who suffered purely economic losses at the hands of negligent defendants with whom no direct relationship existed," not cases involving a breach of contract claim between parties in privity. *Id.* (quoting *People Express Airlines v. Consol. Rail Corp.*, 100 N.J. 246, 495 A.2d 107, 112 (N.J. 1985)).

Plaintiff [*22] has not alleged in Count 7 that Defendants owed it a duty of care. (See 2d Am. Compl. at ¶¶ 140-48.) Beyond this deficiency, however, we find that this is not the type of case in which a claim for negligent misrepresentation is appropriate. Plaintiff's injury stems from the alleged breach of the contracts between Patients 1-50 and Defendants, which were negotiated between the employers of Patients 1-50 and Defendants. Although Plaintiff attempts to distance itself from these contracts in Count 7 by claiming it is asserting Count 7 "non-derivatively," the fact remains that Patients 1-50 have assigned Plaintiff their benefits under the contracts. (Pl. Br. at 20.) The contractual relationship at issue forecloses Plaintiff's tort claim. The Court will dismiss Count 7 as to all plans.

## H. Count 8 - Arbitrary and Capricious

Count 8 alleges that Defendants were obligated to act in accordance with the SPDs, but have not administered the plans "in a consistent, reasonable, or fair manner, and to the contrary" are administering the plans "arbitrarily and capriciously." (2d Am. Compl. at ¶¶ 152-54.) Plaintiff contends that it is being treated arbitrarily and capriciously because Defendants have [*23] made payments to "other similarly situated providers" who also do not technically meet the licensing standard imposed on Plaintiff by Defendants. (Id. at ¶ 156.)

Defendants state that they are unaware of the existence of an "arbitrary and capricious" cause of action under federal or state law. (Defs. Br. at 22.) Plaintiff responds that the "claim for arbitrary and capricious action by Defendant [sic] is . . . properly stated under ERISA" and makes clear that Count 8 seeks benefits under ERISA. (Pl. Br. at 20-21; see 2d Am. Compl. at 30, "Wherefore" clause (demanding a judgment "[d]eclaring that Defendants are precluded from denying payment of claims by Plaintiff individually and as assignee for Services provided to its patients which are Defendants' insureds or plan members")).) However, Plaintiff does not cite to any statutory provision of ERISA, and it is clear that any cause of action Plaintiff is attempting to assert in Count 8 is preempted by ERISA's civil enforcement provision, 29 U.S.C. § 1132(a). See *Aetna Health Inc.*, 542 U.S. at 209. "Arbitrary and capricious" is a legal standard

2010 U.S. Dist. LEXIS 128289, *

that can applied by a court in determining whether a plan administrator improperly denied benefits [*24] under an ERISA plan, not an independent cause of action. See *Doroshow v. Hartford Life & Acc. Ins. Co., 574 F.3d 230, 233 (3d Cir. 2009)* ("[A] denial of benefits challenged under *§ 1132(a)(1)(B)* is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. . . . When the administrator has discretionary authority to determine eligibility for benefits . . . the decision must be reviewed under an arbitrary and capricious standard.") (internal quotation and citation omitted); see also *Saltzman v. Independence Blue Cross, 384 Fed.Appx. 107, 111 (3d Cir. 2010)*. Because Plaintiff separately pleads its cause of action to recover payment of claims for the services provided to Patients 1-50 in Count 10, which is based on *29 U.S.C. § 1132(a)* and not at issue in the current motion, we will dismiss Count 8 for failure to state a claim.

**I. Count 9 - Promissory Estoppel**

Plaintiff asserts in Count 9 that, prior to rendering services to Patients 1-50, it called Defendants to confirm that each of Patients 1-50 "had out of network benefits for facility fees . . . [*25] under their respective insurance agreements or plans with Defendants, and Defendants confirmed that there was such coverage as to each patient." (2d Am. Compl. at ¶ 163.) Plaintiff alleges that the confirmation of coverage "constituted a promise to pay" and caused Plaintiff to rely on the representations of coverage in deciding to render services to Patients 1-50. (Id. at ¶¶ 164-65.) Additionally, Plaintiff alleges that "Defendants' practice and pattern of behavior in paying . . . benefits . . . from August 2008 to February 2009 further induced Plaintiff's reasonable reliance on the promise to pay and confirmation of coverage" as to the patients. (Id. at ¶ 166.)

To state a claim for promissory estoppel, a plaintiff must establish that "(1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) incurred a detriment in said reliance." *Martin v. Port Auth. Transit Corp., No. 09-3165, 2010 U.S. Dist. LEXIS 29522, 2010 WL 1257730, at *5 (D.N.J. Mar. 25, 2010)*. Defendants contend that Count 9 does not satisfy the pleading standard enunciated by Twombly because "the Second Amended Complaint [*26] is devoid of any allegations regarding a 'clear and definite' promise." (Defs. Br. at 23.) Plaintiff responds that it has pleaded all of the elements required by *Martin, supra*.

"[G]enerally, an equitable claim cannot lie where a contract governs the relationship between the parties that gives rise to the equitable claim." *Ready & Motivated Minds, LLC v. Ceridian Corp., No. 10-1654, 2010 U.S. Dist. LEXIS 75388, 2010 WL 2989986, at *7 (D.N.J. July 26, 2010)*. Although Plaintiff is permitted to plead in the alternative, it appears from the Second Amended Complaint that an express contract, namely, the non-ERISA plans, governs Plaintiff's claims, as assignee of the patients insured by the non-ERISA plans.[6] Count 9 does not allege facts distinguishing it from the breach of contract claim; it states only that Defendant told Plaintiff that Patients 1-50 had out of network benefits. Because we have held that Plaintiff's pleading of its breach of contract claim did not satisfy *Twombly*, Plaintiff will be permitted to file an amended pleading setting forth facts supporting a claim for breach of contract as to the non-ERISA plans. Count 9 will be dismissed for failure to state a claim under *Twombly*, but with leave to Plaintiff [*27] to amend this claim as an alternative to its breach of contract claim as to the non-ERISA plans insofar as Plaintiff can set forth a "clear and definite promise" independent of the alleged breach of contract.

6    As discussed above, ERISA preempts all of Plaintiff's state law causes of action as to the ERISA plans because the claims "relate to" the ERISA plans. *29 U.S.C. § 1144*.

**J. Count 11 - ERISA -- Violation of Fiduciary Duty and $110 Per Day Penalty**

Count 11, asserted by Plaintiff in its capacity as assignee of Patients 1-50 and therefore a "beneficiary" under ERISA, seeks payment of a penalty provided by *29 U.S.C. § 1132(c)*, based on Defendants' alleged failure to provide Plaintiff copies of the relevant plan documents until 200 days after such demand was made. (2d Am. Compl. at ¶¶ 198-204.) The relevant statutory provision provides that

[a]ny administrator . . . who fails or refuses to comply with a request for such information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material to the last known address of the [*28] requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

*29 U.S.C. § 1132(c)(1)(B)*.[7] Plaintiff alleges that it requested the plan documents from Defendants on or about August 31, 2009, and confirmed this request through counsel in writing on or about September 16, 2009. (2d Am. Compl. at ¶¶ 199, 201.) The Summary Plan Descriptions for the relevant plans were provided to Plaintiff on March 19, 2010. (Id. at ¶ 208.)

7    The $100 per day penalty was increased to $110 per day for violations occurring after June 29, 1997. *29 C.F.R. § 2575.502c-1.*

Defendants contend that Count 11 "fails to plausibly explain what Plaintiff means by 'ERISA - violation of fiduciary duty.'" (Defs. Br. at 24.) The Court agrees. The Second Amended Complaint does not indicate that Patients 1-50 assigned a claim for violation of fiduciary duty as opposed to a claim for benefits under the plans. Moreover, Plaintiff's brief opposes dismissal of Count 11 only on the  [*29] ground that Count 11 "adequately pleads an ERISA claim for penalties." (Pl. Br. at 22-25.) Because a breach of fiduciary duty claim would be duplicative of Plaintiff's claims for the alleged wrongful denial of benefits and for disclosure penalties, in that the Second Amended Complaint alleges no facts either specifically regarding a breach of fiduciary duty or that would entitle Plaintiff to relief beyond the benefits and disclosure penalties sought, Count 11 will be dismissed insofar as it asserts a claim for breach of fiduciary duty. See *Morley v. Avaya, Inc. Long Term Disability Plan, No. 04-409, 2006 U.S. Dist. LEXIS 53720, 2006 WL 22263336, at *23-24 (D.N.J. Aug. 3, 2006)*.

Defendants contend that the disclosure penalty provision cannot be enforced against them because they are not the plan administrator implicated in *29 U.S.C. § 1132(c)(1)(B)*, but rather the claims administrator for the plans at issue. (Defs. Br. at 29.) To state a claim for relief under *29 U.S.C. § 1132(c)(1)(B)*, a plaintiff must allege "(1) that he is a plan participant or beneficiary; (2) that he has made a written request to a plan administrator for information that falls within the purview of ERISA's disclosure requirements; and (3) that  [*30] the plan administrator failed to provide the requested documents within thirty days of the written request." *Wargotz v. Net Jets, Inc., No. 09-4789, 2010 U.S. Dist. LEXIS 47118, 2010 WL 1931247, at *3 (D.N.J. May 13, 2010)*.

Plaintiff has alleged that it is a plan beneficiary by means of the assignments of benefits from Patients 1-50. (2d Am. Compl. at ¶ 198.) Thus, the first element is satisfied.

The second element requires a showing that a demand was made of a "plan administrator." Plaintiff alleges in Count 11 that the ERISA plans at issue "are ad-

ministered, managed and operated by Defendants . . . under ERISA" and further states that "the claims administrator with regard to the applicable plans . . . is 'CIGNA Corporation.'" (Id. at ¶¶ 200, 207.) Plaintiff thus contends that because "Defendant [sic] is the claims administrator with regard to the applicable plans and also at all material times acted as the plan administrator as well," the second element set forth in Wargotz is met. (Pl. Br. at 23.)

The Second Amended Complaint indicates only that Defendants, doing business as Cigna Corporation, act as claims administrators and not plan administrators under ERISA. "A plan administrator is . . . either expressly designated  [*31] in the plan documents or is the plan sponsor 'if an administrator is not so designated.'" *Wargotz, 2010 U.S. Dist. LEXIS 47118, 2010 WL 1931247, at *5 (citing 29 U.S.C. § 1002(16)(A)(i)-(ii))*. A plan sponsor is

(i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers jointly by one or more employers or one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan.

*29 U.S.C. § 1002(16)(B)*.

Plaintiff's allegation that the relevant SPDs expressly designate "CIGNA Corporation" as the "claims administrator" does not suffice to indicate that Defendants are the plan administrator for the plans at issue. Thus, the potentially liable party under *29 U.S.C. § 1132(c)(1)(B)* would be the plan sponsor of each ERISA plan, not Defendants. See *Campo v. Oxford Health Plans, Inc., No. 06-4332, 2007 U.S. Dist. LEXIS 45804, 2007 WL 1827220, at *4-5 (D.N.J. June 26, 2007)* (holding that employer, not insurer, was "plan  [*32] administrator," and rejecting notion that insurer was "de facto plan administrator" for purposes of *29 U.S.C. § 1132(c)(1)(B)*); see also *Erbe v. Billeter, No. 06-113, 2007 U.S. Dist. LEXIS 72835, 2007 WL 2905890, at *7-8 (W.D. Pa. Sept. 28, 2007)* (dismissing *§ 1132(c)(1)(B)* claim against Connecticut General Life Insurance Company because it was "not vested with the responsibility for plan administration" and noting with approval case law cited by defendant "for the proposition that courts have consistently held an insurance company cannot be held liable

2010 U.S. Dist. LEXIS 128289, *

for ERISA civil penalties when the plaintiff incorrectly directs a request for plan documents to the insurance company responsible for claim processing instead of to the plan administrator").

Plaintiff alleges no facts that could plausibly support a claim against Defendants for liability for failure to disclose documents under *29 U.S.C. § 1132(c)(1)(B)*. Accordingly, Count 11 will be dismissed in its entirety.

## CONCLUSION

For the reasons discussed supra, the Court will dismiss Count 1 through Count 9 and Count 11 of the Second Amended Complaint. Plaintiff will be granted leave to file an amended pleading setting forth claims for (1) payment of benefits due, in its capacity  [*33] as assignee of Patients 1-50, under ERISA's civil enforcement provision, *29 U.S.C. § 1132(a)(1)*, as to the ERISA plans only (i.e., Count 10 of the Second Amended Complaint), (2) breach of contract as to the non-ERISA plans only, and (3) promissory estoppel as to the non-ERISA plans only. Count 2 through Count 8 will be dismissed with prejudice because it appears that amendment would be futile. *Fed.R.Civ.P. 15(a)(2)*; *Grayson v. Mayview State Hosp., 293 F.3d 103, 110 (3d Cir. 2002)*. The Court will issue an appropriate order.

/s/ Mary L. Cooper

**MARY L. COOPER**

United States District Judge

Dated: December 6, 2010